JAMES C. GRINTER v. THE KANSAS PACIFIC RAILWAY COMPANY.

1. DAMAGES, *No Cause of Action for.* G., a citizen of the United States, emigrated from Kentucky to the territory of Kansas, in 1853, and married a Delaware woman, a member of the Delaware tribe of Indians, but was not himself adopted into the tribe. In 1854 he established his residence on the Delaware reservation, in Wyandotte county, and has since lived there. On the 15th of July, 1872, he brought an action in the district court of that county, against the Kansas Pacific railway company, charging the defendant with breaking and entering his close, in November, 1868, and *continuando transgressionem prædictam.* The land which he claimed to possess and occupy had been allotted to his wife and children in severalty, under the provisions of the Delaware treaty of May 30, 1860, and he had no other claim or title to it. *Held,* That he was not entitled to recover any damages, notwithstanding the defendant entered and constructed its road over the land so allotted in severalty, without paying compensation therefor.

2. DELAWARE INDIAN TREATY; *Title to Land.* There is nothing in the Delaware treaty of May 30, 1860, to indicate that any other right or title was granted to the allottees and assignees by the stipulations of articles 1 and 2 than the right of occupancy, with the ultimate fee of the land in the United States.

3. DELAWARE RESERVATION, *Power of Congress Over.* In 1862, congress had the exclusive right and dominion over the Delaware reservation in

Kansas, and had full power to permit the construction of a railroad over such reservation by the Leavenworth, Pawnee & Western railroad company of Kansas, either with or without compensation to be paid by the company.

4. DELAWARE RESERVATION, *Right of Railway Company Over.* Under the provisions of the act of Congress of July 1, 1862, entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific ocean, and to secure to the government the use of the same for postal, military and other purposes," congress granted to the Leavenworth, Pawnee & Western railroad company of Kansas, in 1872 called the Kansas Pacific railway company, now the Union Pacific railway, Kansas division, the right of way through the public lands of the United States for its road, and agreed to extinguish as rapidly as might be the Indian title required for such right of way. This grant included a right of way through the Delaware reservation in Kansas, and under the grant, the company had the authority, in November, 1863, without paying compensation to the Delaware allottees, to, enter upon the reservation for the purpose of locating its line of road and laying out its right of way, and thereafter, of constructing and operating its road over and across said land.

## Error from Wyandotte District Court.

ACTION brought by *Grinter*, against the *Kansas Pacific Railway Company*, to recover damages in the sum of $5,675, for an alleged trespass upon certain lands claimed to be possessed and occupied by the plaintiff. The nature of the action, and the facts, are sufficiently stated in the opinion. Trial at the October Term, 1873, of the district court, and judgment for the defendant. *Grinter* brings the case to this court.

*Guthrie & Brown,* for plaintiff in error:

The act of congress under which defendant in error constructed its line of railway "granted to said company for the construction of its railroad and telegraph line the right of way through the public lands," but in the very same section of the act distinguished between public lands and Indian lands by providing that the government should extinguish the "Indian titles to all lands falling under the operation of the act and required for the said right of way." But this provision, it is evident from a consideration of all the pro-

visions of the act and of the treaty, had relation to Indian titles held by wild tribes in their natural right, and not to lands which had been secured by treaty, and had been allotted in severalty. (*Leavenworth, &c., Rld. Co. v. U. S.*, 2 Otto, 733–744.) It cannot therefore be held to cover the case at bar; or, if construed to relate to lands theretofore allotted in severalty to individual Indians, it then becomes a contract between the government and the railway company, to which plaintiff in error is not a party, and therefore under well-settled and well-understood rules in regard both to the law of contracts and of Indian rights under a treaty, it cannot deprive plaintiff in error of his land.

The government of the United States, since the period of our independence, has pursued a steady system of pacific, just and paternal policy toward the Indians. It has never insisted upon any other claim to the Indian lands than the right of preëmption upon fair terms. (3 Kent's Com. 398; *Fellows v. Lee*, 5 Denio, 628.) It has always admitted the Indians to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it and to use it according to their own discretion, though not to dispose of it at their own will except to the government. (*Johnson v. McIntosh*, 8 Wheat. 543.) Until the Indians have sold their lands, they are to be regarded as still in their ancient possessions, and are in under their original rights and entitled to the undisturbed enjoyment of them. (*Fellows v. Blacksmith*, 19 How. 366.) The right to extinguish Indian titles in any other manner than by purchase or conquest, has never been established nor recognized.

From these considerations, it inevitably follows that the government cannot extinguish the general Indian title nor limit the general Indian estate by a mere congressional grant; and if it cannot do this as to the general Indian title, then for a stronger reason it cannot do so when the Indian title has been specifically recognized by treaty as in the case of these Delaware reserve lands; and this conclusion becomes

intensified in force when (as in the case at bar) the government has further recognized the Indian title by a treaty grant in severalty of a specific eighty acres.

In construing Indian treaties, enlarged rules of interpretation are adopted to favor the Indians. (5 Wall. 760.) Grants of the description of the one to the railway company, are strictly construed against the grantee. (*Dubuque, &c., Railroad Co. v. Litchfield,* 23 How. 66.)

The grant to the defendant in error relates solely to "public lands." There is a marked and well-understood distinction between public lands and Indian lands. Under the rules of construction above stated, how can a grant of a right of way "through public lands" be held to extinguish an Indian title to a specific tract of land which under a treaty has been previously set apart in severalty?

But the treaty and the act, relating to the same subject-matter, should be construed also with reference to each other. "A thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." (1 Bacon's Abr. 247.) To give a construction to the act which would destroy the estate of the plaintiff in error in this land, acquired under the treaty, would be to assume that congress intended to act in bad faith by willfully disregarding the provisions of the treaty — a violent assumption indeed. But to construe the act and the treaty together so as to place the obligation upon the railway company of paying "a just compensation in money" for such of these lands allotted in severalty as were used in the construction of the road, requires nothing to be assumed, and is in accord with the settled policy of the government, and within plainly expressed provisions of both the act and the treaty.

In *Wilcox v. Jackson,* (13 Pet. 498,) the president, by proclamation, had ordered the sale of certain lands, without excepting therefrom a military reservation included within their boundaries. The proclamation was based upon an act of congress supposed to authorize it; but the court held that the act did not apply, and added: "We go further, and say, that

whenever a tract of land shall have been once legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands, and that no subsequent law, proclamation or sale would be construed to embrace or operate upon it, although no reservation were made of it." And in *Leavenworth, &c., Rld. Co. v. U. S.*, supra, the case is cited, with this approval: "The principle is sound and reasonable, and we accept it as a rule of construction;" and with the additional remark: "It applies with more force to Indian than to military reservations." The reason is obvious.

In fine, the case of the *Leavenworth, &c., Rld. Co. v. U. S.*, supra, seems in spirit and in principle to cover the case at bar, and plaintiff in error believes that he cannot furnish the court any stronger argument than the opinion in that case supplies.

*John P. Usher*, for defendant in error:

The history of these Delaware lands is quite succinctly stated in the case of *United States v. Stone*, 2 Wall. 525. By the treaty of May 30, 1860, (the last clause of articles 1 and 2,) provision is made for surveying the lands and assigning them in severalty, to the extent necessary to give to each member of the tribe eighty acres of land. The assignment was to be made of a compact body of the land. The lands were to be inalienable, either in fee, by lease, or otherwise, except to the United States, or to members of the tribe. The tracts were also to be exempt from levy, taxation, sale or forfeiture, *until otherwise provided by congress*. Certain rules and regulations were to be established by the secretary of the interior before certificates of allotment could be issued, providing for the disposition of the lands in case of the death of parties to whom they might be assigned, and, in case of abandonment by any of the Delawares of the lands assigned to them, the secretary of the interior was authorized to make disposition of such lands as in his judgment he might deem necessary and proper.

It will be seen, that though the lands were to be divided

and occupied in severalty by the Delawares, yet their tribal relation to each other was not otherwise affected, nor was the right of the United States in the lands in any respect diminished. The control of the Indians, and the disposition of their lands by the United States, remained the same.

By the last paragraph of article 3, it was agreed that the railroad company defendant should have the perpetual right of way over any portion of the lands allotted to the Delawares in severalty, on the payment of a just compensation therefor in money to the respective parties whose lands are crossed by the line of the railroad. But it is to be noted that this is an agreement between the United States and the Delawares, to which the company is not a party, and could not avail itself of the contract except by permission of congress. And here, it may be said, will be found the whole gist of this matter. Congress had the right to permit the entry and the construction of the road, either with or without compensation to be paid by the company. Congress had the exclusive right and dominion over the entire Delaware reserve. The treaty gave the company no right of entry upon any terms. The company had no power to exercise the right of eminent domain within the boundaries of the Delaware reserve. The act of congress admitting the state into the Union, as well as the organic act for the territory, reserved the power of congress over all the rights of the Indians, their lands and their property. (*The Kansas Indians*, 5 Wall. 754.)

These acts of congress are to be especially noted, as they are not only laws, but compacts between the state and the United States. Upon their examination it will clearly appear that neither the constitution nor laws of the state of Kansas can be invoked in any manner so as to affect the power of congress over the lands. The constitution cannot be invoked as a protection against the right of congress to appropriate the lands to public use without compensation. Neither can the charter of the company or the general laws of the state be resorted to for power to condemn the lands.

To adopt the language of Mr. Justice Davis, in the case of *The Kansas Indians:* "As long as the United States recognizes their (the Delawares') national character, they are under the protection of treaties and the laws of congress, and *their property is withdrawn from the operation of state laws.*" This appears to be conclusive upon this subject.

Congress, by the second section of the act of July 1, 1862, being "An act to aid in the construction of the Pacific railroad," (12 U. S. Stat. at Large, pp. 489–498, § 2,) granted the right of way to the defendant company through the lands in question for its road, and agreed to extinguish as rapidly as might be the Indian title required for the said right of way and grant of land. This grant was of four hundred feet — two hundred feet in width on each side of the railroad.

It has been said that the grant through Indian lands by said § 2 must be construed to be of Indian lands set apart by treaty or otherwise to wild tribes, and not to lands occupied by semi-civilized Indians, but that as to such Indians the constitution and local laws of the state which they inhabit are to have force; but where is the warrant for all this? The judiciary of this state in the matter of *The Kansas Indians* thought to avail itself, for the benefit of the state, of such a theory, but it was met and summarily overthrown by the supreme court of the United States and the unqualified power of congress asserted.

Again, when the controversy arose respecting the supposed grant by congress of the Osage lands to the state, the rights of the Indians in and to their lands were attentively considered, and in the prevailing, and more especially in the dissenting, opinion are those rights discussed. (*Rld. Co. v. United States,* 92 U. S. 733.) Mr. Justice Davis, in construing the Osage treaty and the act of congress, showing that they did not bear the construction claimed by the railroad company, says: "If congress had intended to extinguish the Osage title for the benefit of the appellant, it would have spoken directly, as it did in the Pacific railroad act." And note at p. 747, it is conceded by the judge that the right of

way was in express terms granted through these reserved lands, and that the grant was within the power of congress. Indeed, it is not denied that it was within the power of congress to grant the alternate sections if it had been its will to do so, and it was only by the closest reasoning upon the reservation in the act that a majority of the court came to the conclusion that the grant had not been made, notwithstanding the treaty with the Osages. The power to make the grant was conceded by all the justices. From this, and what is subsequently said by the justice in that case, we are bound to infer that it was the opinion of the court, that if that grant had been in specific and direct terms, congress had the power to make it, although the land had been reserved and set apart for the Osages, as the land in question was for the Delawares. Whoever shall seek to maintain that the right of way over the lands in question was not conferred upon the railroad company by virtue of the grant contained in sec. 2, act of July 1, 1862, must be able to show that congress had not the power to make such grant. That cannot be done. The Kansas Pacific road, in the way prescribed by congress upon which it was to be constructed, necessarily had to pass through the Delaware and Pottawatomie reservations. The fee in the land within these reservations was in the United States, and they were the only Indian lands upon the line of its road, as defined by acts of congress, between the mouth of the Kansas river on the east side thereof, to its junction with the Union Pacific road, and if the grant was not through these Indian lands, it was of no land whatever. It is true that the United States violated the compact in providing for and authorizing the sale of the lands in the Delaware and Pottawatomie reserves, but that does not vary this question.

As to the right of way upon which the railroad company entered in 1863, the grant overrides all treaties prior and subsequent. It is a grant executed. By the location of the road, precision has been given to it. (*M. K. & T. Rly. Co. v. K. P. Rly. Co.*, 97 U. S. 491.)

It is not to be controverted that the title to Indian lands is

in the United States. ( *United States v. Cook*, 19 Wall. 592, 593 ; *Johnson v. McIntosh*, 8 Wheat. 543; *Worcester v. Georgia*, 6 Pet. 580; *Cherokee v. Georgia*, 5 Pet. 48.)

These cases decide that the ultimate title is in the United States, with the power of sovereignty to extinguish the right of occupancy, and that such right and power are exclusive. States have no such power.

Whether the United States, in extinguishing the right of possession, would provide compensation to the Indians, is solely a political question with which the courts have no concern. The only question is, have the United States by act of congress granted the possession of the land in dispute to the railway company? No one will deny that by the second section of the act of July 1, 1862, the grant is as perfect and absolute as congress can make it. It overrides the treaty. By virtue of this grant the defendant is in possession of the land, the fee of which was in the United States, with the sovereign right to take the possession when and how it should be the will of the government to do so. And no judicial tribunal has or ever had power to question the right or the justice of the manner of executing it.

It makes no difference that the lands had been allotted in severalty. They still remained Indian lands within the decisions of the supreme court of the United States, in the cases of *The Kansas Indians.* (5 Wall. 956, 957.)

The opinion of the court was delivered by

HORTON, C. J.: The plaintiff in error (plaintiff below), as appears by the testimony, is a native of Kentucky, and a citizen of the United States. He emigrated to the territory of Kansas in 1853, and soon married a Delaware woman, a member of the Delaware tribe of Indians, but was not adopted into the tribe. In 1854, he established his residence on the Delaware reservation in this state, and has since lived there with his wife. To them have been born ten children. On the 15th day of July, 1872, he brought this action in the district court of Wyandotte county, against the Kansas Pacific

railway company, to recover damages in the sum of $5,675, for an alleged trespass upon certain lands claimed to be in his possession and occupation, but which, theretofore, had been selected and set apart as the property of the wife and children of the plaintiff, in severalty, under the provisions of the treaty with the Delawares, ratified and proclaimed August 22, 1860, generally known as the treaty of May 30, 1860. Art. 1 of the treaty stipulates that—

". . . The Delawares having represented to the government that it is their wish that a portion of the lands reserved for their home may be divided among them in the manner contemplated by the eleventh article of the treaty aforesaid, it is hereby agreed by the parties hereto, that the said reservation shall be surveyed as early as practicable after the ratification of these articles of agreement and convention, in the same manner that the public lands are surveyed, and to each member of the Delaware tribe there shall be assigned a tract of land containing eighty acres, to include in every case, as far as practicable, a reasonable portion of timber, to be selected according to the legal subdivisions of survey."

Art. 2 further stipulates: ". . . Certificates shall be issued by the commissioner of Indian affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned respectively, and that the said tracts are set apart for the exclusive use and benefit of the assignees and their heirs, and said tracts shall not be alienable in fee, leased, or otherwise disposed of, except to the United States or to members of the Delaware tribe, and under such rules and regulations as may be prescribed by the secretary of the interior; and said tracts shall be exempt from levy, taxation, sale or forfeiture, until otherwise provided by congress. . . . And should any of the Indians to whom tracts shall be assigned, abandon them, the said secretary may take such action in relation to the proper disposition thereof as in his judgment may be necessary and proper."

The breaking and entering of the alleged close of plaintiff occurred in November, 1863. About that time the railway company, for the purpose of constructing its road, under the act of congress approved July 1st, 1862, entered upon and took possession of certain portions of the land described in

the petition as a right of way; used timber and stone adjacent to its track, and made cuts and fills, and completed its line of railway over the land, without compensating the plaintiff, or his wife or children. After the first entry, in 1863, the possession of the right of way has been continuous, during which time certain stock has been killed by the railway company in the operation of its road.

The defendant answered the petition, first, by a general denial; second, by setting up the two-years statute of limitations; third, that the defendant entered, if at all, into said premises by and under a license of and from the plaintiff so to do; fourth, that the defendant entered, if at all, into and upon the lands by and under the authority of the United States, as authorized by the treaty of May 30, 1860, between the United States and the Delaware Indians; and in pursuance of the act of congress of July 1, 1862, granting to the defendant a right of way over and across the land. The plaintiff in his reply, denied each and every allegation contained in the second, third and fourth grounds of defense.

The case was tried at the October term of the court for 1873. On the trial, plaintiff produced testimony tending to prove his possession since and prior to November 1, 1863; that a portion of the land had been by him fenced before that time, and that he was then cultivating it; that it had all been fenced and put in cultivation by the plaintiff since that time, and before the commencement of this action; that the defendant entered into and upon said land with force, and without the consent of the plaintiff, and has from that time up to and until the commencement of this suit, continued to break into and upon said land; that while he was upon the same, the defendant threw up, over and across the land a railroad track, and put down wooden ties and iron rails thereon, kept the same permanently there, and continued to run large numbers of heavily-loaded cars, drawn by heavy steam locomotive engines, over and across the land at divers days and times up to and until the commencement of the action. The other facts have already been stated. The

defendant demurred to the evidence for the reason that it was insufficient to authorize any recovery. The court sustained the demurrer, and rendered judgment against the plaintiff for costs. He excepted, and brings the case here.

We need really consider only the fourth defense, and the matters therewith connected, as the final disposition of this case and the merits, particularly of other cases pending, largely turn upon the construction and effect of the provisions of the treaty of 1860, and the act of congress of July 1, 1862. No negligence was shown on the part of the defendant in the injuries to the cattle and hogs, and those injuries having been committed prior to the stock law of 1874, may be regarded, like the allegations and proof of the cutting of timber on the land, as mere matters of aggravation to enhance the damages. Art. 3 of the treaty of 1860 stipulates:

"It is also agreed that the said railroad company [the Leavenworth, Pawnee & Western railroad company] shall have the perpetual right of way over any portion of the lands allotted to the Delawares in severalty, on the payment of a just compensation therefor, in money, to the respective parties whose lands are crossed by the line of railroad."

Sec. 2 of the act of congress of July 1, 1862, provides:

"That the right of way through the public lands be, and the same is hereby granted to said company for the construction of said railroad and telegraph line [the Union Pacific railroad company]; and the right, power and authority is hereby given to said company to take from the public lands adjacent to the line of said road, earth, stone, timber and other materials for the construction thereof. Said right of way is granted to said railroad to the extent of two hundred feet wide on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops and depots, machine shops, switches, side-tracks turn-tables, and water stations. The United States shall extinguish, as rapidly as may be, the Indian titles to all lands falling under the operation of this act, and required for the said right of way and grants hereinafter made."

Sec. 9 further provides that—

"The Leavenworth, Pawnee & Western railroad company of Kansas, is hereby authorized to construct a railroad

and telegraph line, from the Missouri river at the mouth of the Kansas river, on the south side thereof, so as to connect with the Pacific railroad of Missouri, to the aforesaid point, on the one-hundredth meridian of longitude west from Greenwich, as herein provided, upon the same terms and conditions in all respects as are provided in this act for the construction of the railroad and telegraph line first mentioned, and to meet and connect with the same at the meridian of longitude aforesaid," etc.

The defendant is admitted to be the successor of the Leavenworth, Pawnee & Western railroad company, and entitled to all the rights, franchises and powers of the latter company. The Kansas Pacific railway company was originally chartered in 1855, by the territory of Kansas, under the name of the Leavenworth, Pawnee & Western railroad company, mentioned in the said ninth section of the act of 1862, and afterward, in 1863, received the name of the Union Pacific railway company, eastern division, and finally, in 1869, the name by which it is sued herein.

On the part of the plaintiff, it is claimed that the government cannot extinguish the general Indian title by mere congressional grant; that the provision of the act of July 1, 1862, for the extinguishment of the Indian titles to all the lands required for the right of way of the various railroad companies therein named, had reference solely to the territory occupied by wild or blanket Indians, and not to reservations secured by treaty, and occupied by Indians partially or wholly civilized; and, finally, that a grant of a right of way for the road of the defendant over any portion of the lands allotted to the Delawares in severalty without the payment of just compensation therefor, would involve such a gross breach of the public faith, that the presumption is conclusive that congress never meant to grant it.

On the other hand, the defendant contends that congress had the exclusive right and dominion over the entire Delaware reserve, and that by virtue of such right, it had the authority to permit the entry and the construction of the defendant's road, either with or without compensation to be paid

by the company; that as the road, in the way prescribed by congress, was to be constructed necessarily through the Delaware and Pottawatomie reservations, and as these were the only Indian lands between the mouth of the Kansas river on the east side to its junction with the Union Pacific road, reservations secured by treaty were as much included in the grant as the territory of the wild tribes, for if the grant was not through the Delaware and Pottawatomie reservations, there was no grant of right of way whatever to defendant through these reservations; that in brief, the grant of 1862 overrides all treaties prior and subsequent, even to the extent, if necessary, of violating treaty stipulations.

We have had occasion very recently to examine quite fully the question of Indian titles in the case of *Veale v. Maynes*, ante, p. 1. In accordance with the uniform decisions of the supreme court of the United States, we there decided that allotments to Indians upon Indian reservations must be construed in the light of the recognized relations between the government and the Indians, and the established policy of the former toward the latter; that *title* does not necessarily mean title in fee simple; that it may mean any kind of title, even the mere title by occupancy; that the Indian title has been constantly recognized as simply this inferior title; that the government has uniformly asserted its holding of the fee, and has recognized the Indian right as only one of possession. In that case, the Pottawatomie treaties of 1846, 1861 and 1867 were before us for interpretation, and the words "possession and title," and "to guarantee the full and complete possession . . . as their land and home forever," employed in the treaty of 1846, to characterize the estate granted to the Pottawatomies, were certainly as strong, if not stronger, than any of like import used in the Delaware treaty of 1860. We conclude therefore that there is nothing in or about the treaty of 1860 to indicate that any other right or title was granted to the allottees or assignees, or their heirs, by the stipulations of articles 1 and 2, than the right of occupancy with the ultimate fee of the land vested in the

United States.  With this result obtained, it logically follows
that congress had the power to make the grant contained in
section 2 of the act of July 1, 1862, if it really meant that
the grant should include rights of way through reservations
secured by treaty.  (*Rld. Co. v. United States*, 92 U. S. 733,
744.)   The act of congress of March 3, 1863, donating lands
to aid in the construction of certain railroads in Kansas,
granted the right of way through reserved lands for these
roads, and while the supreme court of the United States has
held that the act did not dispose of the Osage lands to the
railroad companies, no one has as yet, as we are aware, ques-
tioned the grant for the right of way through the ceded or
reserved lands.

By the last clause of section 2, the United States agreed
to extinguish as rapidly as might be the Indian titles falling
under the operation of the act, and required for the right of
way.   The language is broad and comprehensive, and not
restricted to the territory of wild tribes.   The only Indian
lands upon the line of defendant's road were reservations se-
cured by treaty.   It was either a grant to the defendant
through these Indian lands, as well said by counsel, or it was
no grant to it through any Indian lands.   By the act of
1862, the company, which the defendant succeeded, was re-
quired to file an acceptance of its provisions within six months
after its passage, and to complete one hundred miles of its
road, commencing at the mouth of the Kansas river, within
two years thereafter; so, immediate and urgent action was
demanded.   If the grant did not include the Delaware reser-
vation, all attempts to construct a road west from the mouth
of the Kansas river over the reservation must have been sus-
pended until arrangements were completed with the allottees
on the lands.   This would have been an insuperable obstacle
to laying out a right of way, and constructing the road.   The
lands were withdrawn from the operation of state laws, and
neither the charter of the company nor the general laws of
the state could be resorted to for power to condemn them.

The company had no authority to exercise the right of

eminent domain within the reserve; and without the power and obligation of the United States to extinguish for its benefit and use the Indian title for a right of way, it can hardly be supposed that the company would have assented to the conditions of the act of 1862, or attempted afterward the construction of its road over and across these Indian lands. Under all the circumstances, we think that within the meaning and scope of the act of 1862, the purpose of congress was to permit the entry and the construction of the road of the Leavenworth, Pawnee & Western railroad company through the reservation without compensation on the part of the company. This view seemingly requires us to consider the objection, whether such a grant would not involve a breach of public faith with the Delaware allottees, over whose lands the right of way of the road was located. While this question may not absolutely affect the power of congress in the premises, yet we cannot well assume that there was any intention by the adoption of the act of 1862 to violate treaty obligations. Previous to the passage of the act, the treaty of 1860 had been duly concluded and proclaimed. Special provision had been made in article 3 for a perpetual right of way over the lands allotted to the Delawares in severalty for the Leavenworth, Pawnee & Western railroad company on the payment of a just compensation in money to the respective parties whose lands were to be crossed by the line of railroad. This was an agreement between the United States and the Delawares, to which the latter company was not a party, and it could not obtain the benefit of the contract except by permission of congress. By the act of 1862 the Leavenworth, Pawnee & Western railroad company became an associated enterprise of the Union Pacific railroad company. The general history of the legislation of congress in reference to this national undertaking for national purposes, and the policy of the government respecting the same, need not be stated here at length, as they are forcibly set forth by Mr. Justice Davis, speaking for the

42—23 KAS.

.court, in the case of *The United States v. The Union Pacific Rld. Co.*, 91 U. S. 72. Therefore it is sufficient to say that congress undertook to enlist private capital and enterprise in the construction of the system of the Pacific railroads when a war of rebellion was in progress and the life of the nation in imminent peril, and agreed to aid the companies having charge of the construction of the roads on account of the supposed advantages — military, postal and otherwise — which the public would derive from the completion of the projected railways. The Delawares had stipulated that the Leavenworth, Pawnee & Western railroad might have a right of way through their reservation upon compensation being paid. The United States agreed to extinguish the Indian titles for the right of way of the Pacific roads as an additional aid to the enterprises, and to induce their early construction. The Leavenworth, Pawnee & Western railroad was incorporated into the system, and the United States assumed the obligation to give it the right of way through the Delaware reservation. This it could do within the exact terms of the treaty of 1860, by paying the Delaware allottees just compensation therefor. Whether such allottees have made a demand of the government for this compensation, we are not advised; clearly, the government, and not the defendant, if anyone, owes the compensation. With this construction and interpretation of the treaty of 1860 and the act of congress of 1862, all is harmony. The Indians are fully protected in their treaty guaranties, and the railway company is protected and secured in its right of way over the Indian lands.

Thus far in our consideration, we have treated the case as if the plaintiff was a member of the Delaware tribe of Indians, and entitled to the rights of an allottee under arts. 1 and 2 of the treaty of 1860. Such, however, is not the fact. He is an intruder on the lands of the tribe. He has no right to plead the treaty of 1860 in his behalf, nor is he authorized to claim any of its guaranties.

The court properly sustained the demurrer, and therefore the judgment will be affirmed.

All the Justices concurring.