KINDRED et al. v. UNION PAC. R. CO.

(Circuit Court of Appeals, Eighth Circuit. February 12, 1909.)

No. 2,671.

1. PUBLIC LANDS (§ 92*)—RIGHTS ACQUIRED BY ALLOTTEES.

The treaty of 1860 (12 Stat. 1129) with the Delaware Indians, which provided that 80 acres of the Delaware Diminished Reservation in Kansas, as defined by prior treaty, should be assigned to each member of the tribe, and the remainder, with specified exceptions, disposed of for their benefit, merely converted the tribal or communal right of occupancy in the lands assigned into a several one, and did not vest the assignees with the title to the land; and it was within the power of Congress to subsequently grant right of way over the same to a railroad company.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 278; Dec. Dig. § 92.*]

2. PUBLIC LANDS (§ 92*) — GRANT TO RAILROAD OF RIGHT OF WAY—CONSTRUCTION.

Act July 1, 1862, c. 120, 12 Stat. 489, which granted a right of way 400 feet wide to the Leavenworth, Pawnee & Western Railroad Company over the public lands on its prescribed route, included such right of way over the lands of the Delaware Diminished Reservation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 278; Dec. Dig. § 92.*]

3. ADVERSE POSSESSION (§ 7*)—RAILROAD RIGHT OF WAY—PUBLIC LANDS.

No part of the right of way granted by Congress to a railroad company over public lands can be alienated without the consent of Congress, nor

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

lost by laches or acquiescence, and private persons encroaching thereon can acquire no right by lapse of time.

[Ed. Note.—For other cases, see Adverse Possession, Dec. Dig. § 7.*]

4. RAILROADS (§ 73*)—RIGHT OF WAY—RIGHT TO PROTECTION BY INJUNCTION.
Equity has jurisdiction of a suit by a railroad company to enjoin owners of adjoining lands from encroaching upon or interfering with its use of its right of way.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 73.*]

Appeal from the Circuit Court of the United States for the District of Kansas.

Frank Doster (A. M. Harvey and Edward D. Osborn, on the brief), for appellants.

R. W. Blair (N. H. Loomis and H. A. Scandrett, on the brief), for appellee.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

HOOK, Circuit Judge.  This was a suit by the Union Pacific Railroad Company as the successor of the Leavenworth, Pawnee & Western Railroad Company, against L. P. Kindred and others, to enjoin them from entering upon and interfering with its right of way in Wyandotte and Leavenworth counties, Kan., along the north side of the Kansas river, through lands within what was once the Delaware Indian Diminished Reservation.  The railroad company claims a right of way 400 feet in width under a congressional grant to its predecessor in title.  The defendants, who are owners of adjacent lands, concede a right of way 100 feet in width, founded, however, only on adverse possession, and are not interfering therewith; but they deny the construction of the act of Congress contended for by the railroad company.  The trial court gave the railroad company a decree, and the landowners have appealed.  Three questions are presented: Had Congress power to grant any right of way across the lands?  If so, did it exercise it?  Is the case of equitable cognizance?

The grounds of the contention that Congress had no power to grant a railroad right of way across the lands in question may be briefly stated as follows:  By the treaty of 1829 made with the Delaware Nation of Indians (7 Stat. 327) it was provided that the country in the fork of the Kansas and Missouri rivers within defined limits "be conveyed and forever secured by the United States to the said Delaware Nation as their permanent residence," and the United States guaranteed "the quiet and peaceable possession and undisturbed enjoyment of the same against the claims and assaults of all and every other people whatsoever."  By the treaty of 1854 (10 Stat. 1048) the Delawares relinquished a part of the reservation to the United States for an expressed consideration, and another part was given up to be sold for their benefit.  The remainder, which was retained for their "permanent home," was known as the "Delaware Diminished Reservation."  It was provided by article 11 of this treaty that whenever the Delawares

desired it the reservation retained should be surveyed, and there should be made a uniform assignment of portions thereof to each person or family as designated by the principal men of the tribe, and by article 12 that railroad companies should have a right of way on payment of a just compensation. The desire of the Delawares for an assignment in severalty led to the treaty of 1860 (12 Stat. 1129), which provided that 80 acres of the reservation should be assigned to each member of the tribe, and the remainder, with some specified exceptions, should be disposed of for their benefit.

The contention is that the effect of this treaty was to vest in the individual assignees an equitable title in fee, and that it was, therefore, beyond the power of Congress thereafter to grant a right of way across the lands so assigned without the consent of the assignees and without the existence and due exercise of the right of eminent domain. It does not appear that after the assignment in severalty the assignees individually assented to the grant of the right of way by Congress, nor does it appear that proceedings in condemnation were instituted. The right of way rests upon a direct grant to the Leavenworth, Pawnee & Western Railroad Company contained in Act July 1, 1862, c. 120, § 9, 12 Stat. 489. The inquiry is therefore directed to the character of the right or title obtained by the individual Indians by the assignment to them of portions of the reservation in accordance with the treaty of 1860. "Was it a mere right of occupancy, with no power to convey the land, except to the United States, or by their consent? Or was it substantially a title in fee simple, with full power of alienation?" That was the test applied in Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, and Francis v. Francis, 203 U. S. 233, 27 Sup. Ct. 129, 51 L. Ed. 165. It was held in those cases that a title in fee may pass to an individual Indian by the operation of a treaty, without the aid of an act of Congress, and without the evidence of a patent. But it is not doubted that, if the right secured was merely one of occupancy, and did not differ from the previous right of the tribe, except that it was several, instead of communal, the United States retained the title, and the dominion and control customarily exercised over Indian reservations and lands.

We think the treaty of 1860 evidences a studied purpose not to vest title in the Indians severally and place it beyond the control of the government, but merely to convert the tribal or communal right of occupancy into a several one. It was an experimental step towards developing a capacity for individual ownership. The usual indicia of transfer of title are wholly absent, except the provisions "that the tracts are set apart for the exclusive use and benefit of the assignees and their heirs," and that prior to the issue of the certificates of assign-ment "the Secretary of the Interior shall make such rules and regulations as he may deem necessary or expedient, respecting the disposition of any of said tracts, in case of the death of the person or persons to whom they may be assigned, so that the same shall be secured to the families of such deceased persons." But the inference that might otherwise be drawn that those provisions imported something more than a mere right of occupancy is dispelled by the further provision that,

"should any of the Indians, to whom tracts shall be assigned, abandon them, the said Secretary may take such action in relation to the proper disposition thereof as in his judgment may be necessary and proper." While a title may pass by a treaty, and neither an act of Congress nor a patent is essential to its vesting, yet an expression of an ultimate purpose to give a patent has been relied on as significant evidence of the intention in cases otherwise doubtful. But that evidence is lacking here. By the treaty of 1860 the title of the United States was neither added nor promised to be added in the future to the right secured by the assignments. On the other hand, specific provision was made in the same treaty for the allotment to four chiefs and the interpreter of the Nation of certain quantities of land in the reservation to be selected by them, and, as if to distinguish the title they were to have from the rights of the ordinary assignees, it was provided they should "receive a patent in fee simple therefor from the President of the United States." The intention to vest in the chiefs and interpreter a right and title different from that assigned in severalty to the other members of the tribe is quite apparent. It was also provided by the treaty that the tracts assigned should not be alienable in fee, leased, or otherwise disposed of, except to the United States or to members of the Delaware tribe, and they were to be exempt from levy, taxation, sale, or forfeiture until otherwise provided by Congress.

We do not doubt that Congress could convert a tribal right of occupancy into an individual one, with right of succession in the heirs and of transfer between the members of the tribe, and yet withhold the title and the same power of dominion it possessed before the assignment in severalty; and we think that is what was done by the treaty of 1860. Though more uniform and equitable, it was similar to the custom of individual occupancy without ownership which other Indian nations had themselves established. Further evidence of this intention is found in the treaty of 1866 (14 Stat. 793), entered into as the result of an expression by the Delawares of a desire to remove to the Indian country between Kansas and Texas. This treaty contemplated the disposition of all of the lands of the Delawares in a body, with an exception in favor of those who should elect to dissolve their relations with the tribe and become citizens of the United States. For those who desired to remain proceedings in court as in naturalization cases were prescribed, and it was provided that "there shall be granted to each of the Delawares who have thus become citizens a patent in fee simple for the lands heretofore allotted to them." But before this treaty was entered into Congress had granted the right of way to the railroad company. By the terms of this treaty the improvements upon the lands to be sold were to be appraised and the value paid to the Indians to whom they belonged, respectively; but there was no such provision as to the proceeds of the lands, nor other recognition of an individual title therein.

The case here is clearly distinguishable from Jones v. Meehan, supra, and the other cases relied on. Congress could have prescribed condemnation proceedings for the acquisition of the right of way, as was the case in Cherokee Nation v. Kansas Railway Co., 135 U. S.

641, 10 Sup. Ct. 965, 34 L. Ed. 295, or, as was done here, it could grant the right of way by legislative act assuming for the government the extinguishment of such Indian title as there was, as well as the payment of compensation. The Supreme Court of Kansas, in Grinter v. Railway Co., 23 Kan. 655, held that the individual Indians secured a mere right of occupancy under the treaty of 1860, and that in 1862 Congress had full power to grant the right of way across the lands so held. The power in Congress is clear. Railway v. Roberts, 152 U. S. 114, 116, 14 Sup. Ct. 496, 38 L. Ed. 377.

We are also of the opinion that Congress, by sections 2 and 9 of the act of July 1, 1862 (12 Stat. 491, 493, c. 120), granted the right of way in question 400 feet in width. The grant of the right of way in section 2, adopted for the Leavenworth, Pawnee & Western Railroad Company by section 9, applied to all public lands in respect of which Congress could so legislate. That the term "public lands" included those in the Delaware reservation is shown, we think, by the final clause of section 2, wherein the United States assumed the duty of extinguishing the Indian titles. The exceptions and reservations found in section 3 of the act related to the donation of lands in aid of the construction of the railroad, and doubtless included Indian reservations like that of the Delawares. They are the customary exceptions and reservations in such cases, but it is apparent they have no relation to the right of way granted by the second section. The application of them exclusively to the land grant indicates the intention of Congress to give a right of way across all lands, without exception, so far as it was within its power to do so.

There are obvious reasons why the government should have refrained from donating in aid of railroad enterprises specific lands within reservations previously set apart by treaty to Indian tribes, and yet, having the power, should have granted a right of way through them, taking upon itself the duty of adjusting claims for compensation. It is not to be supposed that Congress, in prescribing a route for the construction of a railroad that would in all probability run through an Indian reservation, intended that the railroad company should deal with individual Indians, to whom the right of occupancy had been assigned in severalty, in securing the necessary right of way, especially when the Indians were still in a state of pupilage and the government, as their guardian, still retained the title and dominion over the lands set apart for their use. There were no provisions in the act of 1862 conferring upon the railroad company the power of eminent domain, and those of the later act of July 2, 1864 (13 Stat. 356, c. 216), were intended to apply, not to lands like those of the individual Delawares, but to those held by persons whose rights and titles were ordinarily judicable in proceedings in courts of justice. That a right of way 400 feet in width across the lands in question was granted by the act of Congress was held in Grinter v. Railway, 23 Kan. 655, and was assumed without dispute in Union Pacific Railway Company v. Kindred, 43 Kan. 134, 23 Pac. 112. It is shown by stipulation in the record before us that Mr. Justice Brewer, when United States Circuit Judge, referred to the Grinter Case in Union Pacific Railway Compa-

ny v. Shannon, here published in the margin,[1] and said that as a member of the Supreme Court of Kansas he took part in the decision and had no reason to doubt its correctness.

It was conclusively determined by the act of Congress that a right of way 400 feet in width was essential to the performance of the public duties assumed by the grantee upon its acceptance of the grant. No part of that right of way could be alienated without the consent of Congress, nor lost by laches or acquiescence. Northern Pacific v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157; Northern Pacific v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044; Northern Pacific v. Ely, 197 U. S. 1, 25 Sup. Ct. 302, 49 L. Ed. 639. It became in a sense a national public highway, and private encroachments upon it could be neither strengthened nor confirmed by lapse of time.

[1]Union Pac. Ry. Co. v. Shannon et al.

(Circuit Court, D. Kansas.)

BREWER, Circuit Judge. This is a bill to restrain defendant and his successors in office from entering upon the right of way of complainant, and from prosecuting any suits, civil or criminal, against the complainant or its employés on account of their quarrying stone on said right of way. The defendant insists that a public highway exists over said right of way and parallel to complainant's track, and his efforts and actions are simply to protect such public highway. That the complainant owns a right of way 200 feet in width on either side of its track has been decided by the Supreme Court of Kansas. Grinter v. U. P. Ry. Co., 23 Kan. 642. I, as a member of that court at the time of that decision, took part therein, and have no reason to doubt its correctness or its binding force on this court. That the proceedings of the county commissioners of Leavenworth county for the opening of a public highway at the place in question were insufficient has also been decided by that court. State v. Horn, 34 Kan. 556, 9 Pac. 208. And that no public highway exists by prescription has likewise been decided. State v. Horn, 35 Kan. 717, 12 Pac. 148. While proceedings have been instituted before the county commissioners to correct the record of the highway proceedings, and the county commissioners have attempted to make such correction, yet an appeal has been taken from their order, and such appeal vacates their action, and leaves the matter now as though no such action had been had. Blackshire v. Railroad Co., 13 Kan. 514.

Of course, with only these facts presented, the complainant would be entitled to protection in the peaceful enjoyment of its right of way. But defendant further insists upon an estoppel. I do not think this claim of an estoppel is made out. This alleged highway, the Duncan road, as it is called, runs on the north side of the railroad track at the point in question. Years ago it crossed to the south of the track, about one mile and a half east, and ran on such south side for some distance. At the instance of the superintendent of the complainant's road this part south was changed to the north side, and in consideration thereof complainant built two bridges on the line of the new road. But all this change and this work on bridges was made more than a mile and a half distant from the land in dispute. Why complainant's action as to a piece of road a mile and a half distant should estop it from pleading the truth as to this is not apparent. Nothing was represented expressly or impliedly as to this by complainant. Defendant had equal knowledge with complainant. He was not misled by complainant's action. He did not rely thereon and parted with nothing on the faith thereof. Scarcely a single element of estoppel can be found.

Equally immaterial is the fact testified to of complainant working out its road tax on a part of this highway, or the alleged convenience in opening a road elsewhere. The public has had ample notice and time to open a new road. I see nothing to justify interference with complainant's rights, and a decree must go as prayed for.

Possession of portions thereof by individuals was not adverse, in the sense that it might ripen into title; nor, however long it was permitted to continue, did it preclude the railroad company from performing its duty by asserting its right thereto whenever the necessity for the full use arose. That for a long time it maintained its right of way fences within the exterior limits of the strip gave the adjacent landowners nothing more than a permissive use of the uninclosed portions, and when it became inconsistent with the public use to which the right of way was dedicated by Congress the railroad company properly removed its fences and resumed possession. Under such circumstances it cannot be said, when it applied to a court of equity to protect the right of way from continued encroachments, that it came with unclean hands. The title of the railroad company, which is said to be that of a limited fee (Northern Pacific v. Townsend, supra), is not so dissimilar from an easement as to render inapplicable the remedy appropriate to the latter (Louisville & N. R. Co. v. Smith, 63 C. C. A. 1, 128 Fed. 1).

Affirmed.