STUART et al. v. UNION PAC. R. CO.

(Circuit Court of Appeals, Eighth Circuit.   May 2, 1910.)

No. 3,033.

*(Syllabus by the Court.)*

**1.** QUIETING TITLE (§ 13*)—POSSESSION BY DEFENDANT—MAINTENANCE OF SUIT.

Generally speaking, in the courts of the United States a suit to quiet title cannot be maintained by a complainant who is not in possession against a defendant who is in possession, because there is a plain,' complete, and adequate remedy at law; but in exceptional cases, where there is no such remedy at law, the general rule does not apply.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. § 8;  Dec. Dig. § 13.*

Necessity of possession in suits to quiet title, see notes to Jackson v. Simmons, 39 C. C. A. 522.]

**2.** QUIETING TITLE (§ 12*)—LAND OCCUPIED AS RAILROAD RIGHT OF WAY— WHEN SUIT MAINTAINABLE.

Where a landowner, without objection, permits a railroad company, clothed with the power of eminent domain, to enter upon his land, construct its road thereover, and put the same in operation, without first making compensation therefor, he is precluded from ousting the railroad company from its actual possession or interrupting the operation of its road;  and where the extent of the railroad company's actual occupancy and use of the land for railroad purposes is in dispute, so that the landowner cannot maintain an action merely to recover compensation without either conceding the greater occupancy and use asserted by the railroad company or risking a recovery of less than he actually is entitled to receive, he is without a plain, complete, and adequate remedy save by a suit in equity in the nature of one to quiet title, and this although he be not in possession of any part of the land.

[Ed. Note.—For other cases, see Quieting Title, Dec. Dig. § 12.*]

**3.** PUBLIC LANDS (§ 92*)—GRANT TO RAILROAD—RIGHT OF WAY—CONSTRUCTION.

The right of the Union Pacific Railway Company, Eastern Division, to extend its road west of the 100th meridian via Denver to a connection with the main line of the Union Pacific Railroad, was derived from the provision in section 9 of Act July 2, 1864, c. 216, 13 Stat. 360, and a right of way 400 feet in width "through the public lands" for the road as so extended was one of the benefits accorded to the company by that provision. Upon the present record it is held that this right of way over the land in question was effective from the date of the grant, July 2, 1864;  the land being then a part of the public lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 281;  Dec. Dig. § 92.*]

Appeal from the Circuit Court of the United States for the District of Colorado.

Bill by Thomas B. Stuart and Charles A. Murray against the Union Pacific Railroad Company.   Decree for defendant, and complainants appeal.   Reversed, with directions.

Joseph C. Helm and Charles A. Murray (Thomas B. Stuart, on the brief), for appellants.

Clayton C. Dorsey (William V. Hodges, on the brief), for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and WILLIAM H. MUNGER, District Judge.

VAN DEVANTER, Circuit Judge. According to the bill of complaint, this is a suit to quiet in the appellants, as against the appellee, the title to an entire tract of land containing 160 acres and located in the vicinity of Denver, Colo.; but it otherwise appears that what really is in controversy is only so much of this tract as is within a claimed railroad right of way across the same.

In addition to other matters not necessary to be stated here, the bill alleges that the full ownership, possession, and right of possession of the entire tract are in the appellants; that their title is founded upon that of one Eastman, who, in accordance with the pre-emption laws of the United States, initiated a pre-emption claim to the tract on June 16, 1866, by settling thereon and filing in the proper land office the requisite declaratory statement, carried the claim to final entry on January 2, 1867, and received a patent on October 1, 1867.

The answer, while expressly admitting the allegations of the bill relating to Eastman's pre-emption claim and to the steps resulting in the issuance of a patent to him, alleges that the appellee is the owner, and is in exclusive possession, of so much of the entire tract as lies within lines drawn parallel to and 200 feet distant on either side, from the center line of the main track of the appellee's railroad where it traverses such tract; that the appellee's title and right of possession to this strip or right of way are founded upon Act Cong. July 1, 1862, c. 120, 12 Stat. 489, and other acts supplemental thereto and amendatory thereof, known as the "Pacific Railroad acts"; that this title and right of possession are older than and superior to any title founded upon Eastman's pre-emption claim; that the railroad now existing along and over such right of way was constructed by the appellee's predecessors in title, under the authority granted in the Pacific Railroad acts and in conformity therewith; and that continuously since such construction the appellee's predecessors in title and the appellee have possessed and enjoyed such right of way.

Upon the final hearing the Circuit Court entered a decree dismissing the bill, and an appeal brings the case here.

In our opinion, the proofs submitted to the Circuit Court establish that the situation at the commencement of the suit was as follows: The entire tract was open, unimproved, and not in the actual possession of any one, save as a claimed railroad right of way across the same was fenced, improved, and used for railroad purposes by the appellee. The appellants, as remote grantees of Eastman, were the owners of the full title to the entire tract, save as the appellee may have become entitled to a right of way across the same. The appellee was the successor in title of the Leavenworth, Pawnee & Western Railroad Company, whose name was changed in 1863 to the Union Pacific Railway Company, Eastern Division, and in 1869 to the Kansas Pacific Railway Company. Under the authority granted in the Pacific Railroad acts, and in conformity therewith, this company constructed a railroad from the Missouri river, at the mouth of the Kansas river, westward to Denver, Colo., and thence northward, under an arrangement with the

Denver Pacific Railway & Telegraph Company, to a connection with the main line of the Union Pacific Railroad at Cheyenne, Wyo. The railroad so extending from the Missouri river to Denver traverses the tract now in question, was constructed in its present location in 1870, and has been in operation continuously since that time. While the appellee's predecessors in title and the appellee supposed and claimed that the Pacific Railroad acts granted a right of way 400 feet in width across this tract, their actual use of the same for right of way purposes was confined to a strip of 100 feet in width, being 50 feet on either side of the center line of the main track of the railroad; and this much of the tract was fenced, improved, and in the actual possession of the appellee at the commencement of the suit. But the evidence discloses a pronounced and bona fide dispute respecting the extent, in point of width, of such actual use and occupancy. The taking and use of this right of way were not sanctioned by any conveyance from Eastman or his successors in title, and none of them was compensated for any damages occasioned thereby. Nor was any objection interposed to such taking and use, save as the appellants or their predecessors in title, on several occasions after 1891, indicated to the railroad company that it was without any title to the strip used as a right of way, and that they would insist upon some adjustment of the matter.

There was some evidence indicating that a map showing the general route of the railroad westwardly to the eastern Colorado line was filed with the Secretary of the Interior prior to November 30, 1866, the date not being more definitely stated; that a map showing the general route from the eastern Colorado line to Denver was accepted by that officer November 30, 1866; and that a map showing the definite location of the railroad to Denver was filed in the land office at Denver September 24, 1870. But none of these maps nor any better statement of what was shown thereon was offered in evidence.

On October 19, 1872, the President accepted the road as duly completed to Denver in conformity with the Pacific Railroad acts.

As to the payment of taxes, about which opposing counsel seem to differ, we think the evidence shows that the entire tract was assessed to the appellants, without any deduction of a right of way; that a 400 foot strip across the tract was included in the entire railroad right of way assessed to the appellee; and that taxes based upon such assessments were paid in due course by the appellants and the appellee respectively, no notice being taken of the double taxation involved therein. And this being so, neither party can derive any special advantage from the payment of taxes.

Notwithstanding the admission to the contrary in the answer, the appellee now suggests that Eastman did not perfect, but abandoned, his pre-emption claim and obtained title through the location of a military bounty land warrant on January 2, 1867. Passing the fact that the admission in the answer cannot be rejected, we think the suggestion is not well taken. The register of the Denver land office, who was called as a witness, produced the tract book of his office and, without objection, testified that this book recited the filing of Eastman's pre-emption declaratory statement on June 18, 1866, and showed that on

January 2, 1867, he "made final proof upon the land described, which he paid for by warrant No. 105,577." If he was abandoning his preemption claim, there was no occasion for making final proof; but, if he was perfecting that claim, it was necessary that such proof be made. The pre-emption law (Act Sept. 4, 1841, c. 16, 5 Stat. 453) required the claimant to make proof, commonly styled "final proof," of his inhabitance and improvement of the land, and to pay therefor at the rate of $1.25 per acre; and the law relating to military bounty land warrants (Act March 22, 1852, c. 19, 10 Stat. 3) permitted pre-emptors to use such warrants in making the payment so required. The warrant, No. 105,577, used by Eastman was a military bounty land warrant, and its value, computed at the statutory rate, was identical with the amount Eastman had to pay to obtain title though his pre-emption claim. So, reading the evidence in the light of the statutes mentioned, we conclude that he perfected that claim and did not abandon it, which is important only as it shows that the title under the Eastman patent was initiated June 18, 1866, when he settled upon the land and filed the requisite declaratory statement, and not January 2, 1867, when he made use of the warrant.

We now come to the contention of the appellee that the case made by the evidence is not one of equitable cognizance, because the appellants are not in possession of any part of the tract and the appellee is in possession of a part of it.

It is true, generally speaking, that in the courts of the United States a suit to quiet title cannot be maintained by a complainant who is not in possession against a defendant who is in possession; and this is so because there is a plain, complete, and adequate remedy at law. Whitehead v. Shattuck, 138 U. S. 146, 150, 11 Sup. Ct. 276, 34 L. Ed. 873; United States Mining Co. v. Lawson, 67 C. C. A. 587, 134 Fed. 769; Lawson v. United States Mining Co., 207 U. S. 1, 9, 28 Sup. Ct. 15, 52 L. Ed. 65. But it also is true that in exceptional cases, where there is no such remedy at law, the general rule does not apply. In our opinion this is such a case. What really is the subject of the adverse claims of the parties is a strip 400 feet in width along the appellee's railroad. Part of this is in the actual possession of the appellee, is occupied by permanent and costly railroad structures, and is being used as a right of way for strictly railroad purposes. If it be not true that the Pacific Railroad acts granted a right of way 400 feet in width across the Eastman tract, it still is true that they authorized the acquisition, by agreement or condemnation, of a right of way thereover, not exceeding 200 feet in width. The owners of the tract did not insist that the railroad be not constructed and put in operation in advance of an exercise of this authority, but by their silence and inaction acquiesced in such construction and operation without any precedent agreement or condemnation. The railroad has been in operation since 1870, and its continued operation has become a matter of large public concern. In addition, there is a pronounced and bona fide dispute as to how much of the tract has been occupied and used as a right of way; the appellants insisting that this occupancy and use have been confined to 25 feet or less on either side of the center line of the railroad, and the appellee insisting that they have extended to 50 feet or more on

either side. In these circumstances it is apparent, as we think, that the appellants are entitled to a hearing and decision as to what extent the appellee is entitled to occupy and use the tract as a right of way, that they are not entitled to oust the appellee from its actual possession or to interrupt the operation of its railroad, and that their rights can be completely and adequately determined by a suit in equity in the nature of one to quiet title, but not otherwise. As was said in Northern Pacific Railroad Co. v. Smith, 171 U. S. 260, 271, 18 Sup. Ct. 794, 798, 43 L. Ed. 157:

"There is abundant authority for the proposition that, while no man can be deprived of his property, even in the exercise of the right of eminent domain, unless he is compensated therefor, yet that the property holder, if cognizant of the facts, may, by permitting a railroad company, without objection, to take possession of the land, construct its track, and operate its road, preclude himself from a remedy by an action of ejectment. His remedy must be sought either in a suit in equity, or in a proceeding under the statute, if one be provided, regulating the appropriating of private property for railroad purposes."

Other cases of like import are Roberts v. Northern Pacific R. R. Co., 158 U. S. 1, 11, 15 Sup. Ct. 756, 39 L. Ed. 873; Penn. Life Ins. Co. v. Austin, 168 U. S. 685, 698, 18 Sup. Ct. 223, 42 L. Ed. 626; New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Donohue v. El Paso & Southwestern R. R. Co., 214 U. S. 499, 29 Sup. Ct. 698, 53 L. Ed. 1060.

There may be cases in which an action for compensation or damages under the statute would afford a plain, complete, and adequate remedy; but this is not such a case, for, in the absence of a prior determination of the dispute respecting the width of the strip actually occupied and used as a right of way, such an action could not be maintained without either conceding the greater occupancy and use asserted by the appellee or risking a recovery of less than the actual damages. A remedy cannot be regarded as plain, complete, and adequate when to pursue it is to jeopardize a part of what is claimed, irrespective of the merits.

The question next to be considered is: Did the grant of a right of way 400 feet in width for this railroad, as made by the Pacific Railroad acts, embrace the strip here in controversy? That those acts granted such a right of way "through the public lands" does not admit of any doubt; but to answer the question just stated it is necessary to determine: First, when the right of way was granted for the portion of the road traversing the Eastman tract; and, second, whether this tract was then a part of the public lands.

The first of the Pacific Railroad acts, so called, is that of July 1, 1862 (12 Stat. 489, c. 120) which by its first section authorized the construction of a railroad and telegraph line, since known as the main line of the Union Pacific, from an initial point "on the one hundredth meridian of longitude west from Greenwich, between the south margin of the valley of the Republican river and the north margin of the valley of the Platte river, in the territory of Nebraska, to the western boundary of Nevada Territory"; by its second section granted a right of way "through the public lands" for the construction of such railroad and telegraph line "to the extent of two hundred feet in width on each

side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, and depots, machine shops, switches, sidetracks, turntables, and water stations"; by its third section granted in aid of the construction of such railroad and telegraph line, certain alternate odd-numbered sections of public lands; and by its ninth section authorized the Leavenworth, Pawnee & Western Railroad Company to construct a line of railroad and telegraph from the Missouri river, at the mouth of the Kansas river, "to the aforesaid point on the one hundredth meridian, * * * upon the same terms and conditions in all respects as are provided in this act for the construction of the railroad and telegraph line first mentioned, and to meet and connect with the same at the meridian of longitude aforesaid."

The next of those acts is the amendatory one of July 2, 1864 (13 Stat. 356, c. 216), which by its third section authorized any of the railroad companies affected to acquire for its railroad, by agreement with "the owner or claimant" or by condemnation, "any lands or premises that may be necessary and proper for the construction and working of said road, not exceeding in width 100 feet on each side of its center line," and by its ninth section declared:

"That any company authorized by this act to construct its road and telegraph line from the Missouri river to the initial point aforesaid, may construct its road and telegraph line so as to connect with the Union Pacific Railroad at any point westwardly of such initial point, in case such company shall deem such westward connection more practicable or desirable; and in aid of the construction of so much of its road and telegraph line as shall be a departure from the route hereinbefore provided for its road, such company shall be entitled to all the benefits and subject to all the conditions and restrictions of this act; provided, further, however, that the bonds of the United States shall not be issued to such company for a greater amount than is hereinbefore provided, if the same had united with the Union Pacific Railroad on the 100th degree of longitude; nor shall such company be entitled to receive any greater amount of alternate sections of public lands than are also herein provided."

And by its twelfth section declared:

"And if the Union Pacific Railroad Company shall not be proceeding in good faith to build the said railroad through the territories when the Leavenworth, Pawnee and Western Railroad Company, now known as the Union Pacific Railroad Company, Eastern Division, shall have completed their road to the hundredth degree of longitude, then the last-named company may proceed to make said road westward until it meets and connects with the Central Pacific Railroad Company on the same line. And the said railroad from the mouth of the Kansas river to the one hundredth meridian of longitude shall be made by the way of Lawrence and Topeka, or on the bank of the Kansas river opposite said towns."

The next of those acts is the further amendatory one of July 3, 1866 (14 Stat. 79, c. 159), which extended the time for filing a map designating the general route of the railroad of the Union Pacific Railroad Company, Eastern Division, provided for the withdrawal from sale of the lands along the entire line thereof so far as the same should be so designated, and declared:

"Provided, that said company shall be entitled to only the same amount of the bonds of the United States to aid in the construction of their line of railroad and telegraph as they would have been entitled to if they had connected their said line with the Union Pacific Railroad on the one hundredth degree

of longitude as now required by law: And provided further, that said company shall connect their line of railroad and telegraph with the Union Pacific Railroad, but not at a point more than fifty miles westwardly from the meridian of Denver in Colorado."

The next of those acts is the one of March 3, 1869 (15 Stat. 324, c. 127), which authorized the Union Pacific Railroad Company, Eastern Division, (1) to contract with the Denver Pacific Railway & Telegraph Company for the construction and operation by the latter of that portion of the former's line of railroad and telegraph between Denver and its point of connection with the Union Pacific Railroad at Cheyenne; (2) to grant to the Denver Pacific Railway & Telegraph Company "the perpetual use of its right of way and depot grounds," and to transfer to the latter company "all the rights and privileges, subject to all the obligations, pertaining to said part of its line"; and also declared that the alternate sections granted in aid of the construction of this line of railroad and telegraph should be so divided between the two companies that each would receive the sections along the portion of the line constructed by it.

As the Eastman tract is west of the 100th meridian, and as the act of 1862 fixed that meridian as the western terminus of this line of railroad, it is plain that the appellee's claim to the right of way now in question cannot be rested upon that act alone; and this is freely conceded. But the appellee invites attention to the language of the ninth section of the amendatory act of 1864, as hereinbefore set forth, whereby the railroad company was authorized to change the western terminus so as to connect with the main line of the Union Pacific "at any point westwardly" of the 100th meridian, if it deemed such westward connection more practicable or desirable, and whereby it was provided that any such departure in route should be attended by the same benefits and restrictions, other than a subsidy in bonds, as were provided in respect of the original route; and it then urges that the subsequent construction of this line of railroad via Denver to a connection with the main line of the Union Pacific at Cheyenne was in accord with this authorization, and that a right of way 400 feet in width through the public lands was one of the benefits which attended this departure in route. If the first branch of this contention be sound, it does not admit of any doubt that the other branch also is sound; and, if both be sound, it is altogether clear upon this record that the appellee is entitled to the entire strip now in controversy, that its title thereto dates from the passage of the act of 1864, when the Eastman tract was concededly within the category of public lands, and that its title is not affected by the fact that the full width of the strip has not as yet been actually occupied and used for right of way purposes. Railroad Company v. Baldwin, 103 U. S. 426, 26 L. Ed. 578; Bybee v. Oregon & California R. R. Co., 139 U. S. 663, 679, 11 Sup. Ct. 641, 35 L. Ed. 305; Northern Pacific Ry. Co. v. Hasse, 197 U. S. 9, 25 Sup. Ct. 305, 49 L. Ed. 642; Missouri, Kansas & Texas Ry. Co. v. Cook, 163 U. S. 491, 497, 16 Sup. Ct. 1093, 41 L. Ed. 239; Northern Pacific R. R. Co. v. Smith, 171 U. S. 260, 275, 18 Sup. Ct. 794, 43 L. Ed. 157; Northern Pacific Ry. Co. v. Townsend, 190 U. S. 267, 272, 23 Sup. Ct. 671, 47 L. Ed. 1044; Kindred v. Union Pacific R. R. Co., 94 C. C. A.

112, 118, 168 Fed. 648, 654. Therefore the first branch of the contention is the one which is principally to be considered. To sustain it, the appellee relies upon Missouri, Kansas & Texas Ry. Co. v. Kansas Pacific Ry. Co., 97 U. S. 491, 494, 24 L. Ed. 1095, where it was held that the amendatory act of 1864 "authorized the plaintiff (the predecessor of the appellee here) to construct its road and telegraph line so as to connect with the Union Pacific Road at a point west of its initial point (the 100th meridian), in case it deemed such westward connection more practicable or desirable"; and also relies upon United States v. Kansas Pacific Ry. Co., 99 U. S. 455, 457, 25 L. Ed. 289, where it was held:

> "The authority of the company to extend its road west of the one hundredth meridian was derived from the ninth section of the act of 1864, which declared as follows: (Quoting what is hereinbefore set forth.) It thus appears that whilst the company was authorized to extend its road west of the one hundredth meridian, if it saw fit so to do, it was entirely in its option; and, if it did, it was not to expect, or have, any subsidy of government bonds for such extension. It is found by the court that the company actually extended its road westward as far as Denver, 245 miles west of the one hundredth meridian, but did not complete the same to that point, so as to be accepted by the President, until the 19th of October, 1872. * * * From a careful examination of the statutes relating to the subject, we are of opinion that, *whilst, as to the entire line, the company, in the words of the ninth section of the act of 1864, is 'entitled to all the benefits and subject to all the conditions and restrictions of the act'* (italics are ours), and is bound to furnish transportation and telegraphic accommodations to the government on the usual terms; yet that the subsidy bonds granted to the company, being granted only in respect of the original road, terminating at the one hundredth meridian, are a lien on that portion only; and that the 5 per cent. of the net earnings is only demandable on the net earnings of said portion."

What was thus said seems to be decisive of the question; but, were the question an open one, we should resolve it in the same way, because of the very plain language of section 9. The Attorney General seems also to have resolved it in this way, for in an opinion given to the Secretary of the Interior on April 16, 1866 (11 Op. Attys. Gen. 462), he said:

> "Now in reading these statutes, * * * we must further read the ninth section of the act of 1862, amended by the provision of the ninth section of the act of 1864, just cited, as if it had enacted that the company in question might construct a railroad from the mouth of the Kansas river to the initial point of the Union Pacific Railroad, on the 100th meridian, or construct its road so as to connect with that railroad at any point westwardly of its initial point. That was the option, it would seem, intended to be conferred by Congress upon the present company."

And like views were expressed during the debates upon the later act of 1866. Thus, the chairman of the committee on Pacific Railroads, who was in charge of that bill in the Senate, said, in explaining the purpose of its first section (Cong. Globe, 39th Cong., 1st Sess., p. 3256):

> "By the act of 1862 all these eastern branches of the main stem were required to unite with the main stem on the one hundredth degree of longitude. Such was the effect of the act of 1862 incorporating the Union Pacific Railroad Company. But by the act of 1864, amending the original charter of the company, it is provided that any of these branches may unite with the main stem at a point west of the one hundredth meridian, if they shall see fit to do so. In this connection I will call the Senator's attention to the ninth section of the act of 1864. He will find it in the second proviso contained in that section:

" 'And provided further, that any company authorized by this act to constuct its road and telegraph line from the Missouri River to the initial point aforesaid'—

"That is the one hundredth degree of longitude—'may construct its road and telegraph line so as to connect with the Union Pacific Railroad'—

"That is the main stem—'at any point westwardly of such initial point, in case such company shall deem such westward connection more practicable or desirable; and in aid of the construction of so much of its road and telegraph line as shall be a departure from the route hereinbefore provided for its road, such company shall be entitled to all the benefits and be subject to all the conditions and restrictions of this act: Provided further, however, that the bonds of the United States shall not be issued to such company for a greater amount than is hereinbefore provided, if the same had united with the Union Pacific Railroad on the one hundredth degree of longitude; nor shall such company be entitled to receive any greater amount of alternate sections of public lands than are also herein provided.'

"It will be seen from that that the privilege of making the junction at a point west of the one hundredth degree of longitude has been secured to all these companies for some two years past. Now, in regard to the Pacific Railway, Eastern Division, it was required by the statute that that branch, known as the 'Kansas Branch,' should locate its route within a given period of time, which period has elapsed, and the object of the first section of this bill is simply to extend to that branch the right of locating its route until the 1st of December next; but the first section requires positively, in express terms, that the eastern division shall form a junction with the main stem of the Union Pacific Railroad Company at some point not more than 50 miles west of the meridian of Denver. They are not, therefore, at liberty to extend their route to a point further west than fifty miles west of Denver without forming a junction with the main stem. Whether they will form a junction at that point, or east of that point, is not perfectly certain. It depends upon their interests, of course, at what point they will form the junction; but they are required positively, by law, to form the junction, so that the eastern division may operate at all times as a feeder to the main trunk, the Union Pacific Railroad proper. The first section, as amended, contains further language guarding against any misconstruction of existing statutes upon the subject. It declares:

" 'That said company shall be entitled to only the same amount of the bonds of the United States to aid in the construction of their line of railroad and telegraph as they would have been entitled to if they had connected their said line with the Union Pacific railroad on the one hundredth degree of longitude, as now required by law.'

"So it gives to the Eastern Division, in reference to subsidies, precisely the same right that it always has possessed, and no further right—nothing more. They will not be entitled to a dollar by way of subsidy for any part of their route west of the 100th degree of longitude. The committee has been extremely careful so to word the bill as to save to the government and the public that right."

And Mr. Stevens, who was in charge of the bill in the House, said, in the course of a like explanation (Id. p. 3422):

"The Union Pacific Railroad starts from an initial point upon the 100th degree of longitude to be fixed by the President, a point which never has been fixed. The various branches—the Omaha Road and the Kansas Road—were originally to unite on that initial point with that railroad, and they were to unite within certain points on the banks of the Kansas and of the Platte. * * * Some time after, in 1864, application was made to the House to allow any one of these branches that chose to do so to unite with the Union Pacific Railroad anywhere they chose west of the 100th degree of longitude, provided they received no more bonds than if they went to the 100th degree. The act of 1864, which I hold in my hand, gave either of these branches a right to unite with the Union Pacific Railroad and go westward as far as they pleased without reference to the initial point, provided they should have no more than $16,000 per mile up to the 100th degree."

But the appellants contend with much earnestness that no such change in the route or western terminus of this road was authorized by section 9 of the act of 1864, because the language of that section was restrained by section 12, and because the act of 1866 treated or construed the act of 1864 as leaving the point of connection with the main line of the Union Pacific as fixed in the original act of 1862. We cannot assent to either branch of this contention. Whilst the provision in section 12, "and the said railroad from the mouth of the Kansas river to the 100th meridian of longitude shall be made by the way of Lawrence and Topeka, or on the bank of the Kansas river opposite said towns," if taken alone, gives rise to an implication that the western terminus was to be on the 100th meridian, the implication is too slight to overcome or restrain the plain and direct language of the provision in section 9. These provisions, separated as they are, relate to distinct subjects; one to the location of the western terminus, and the other to the location of a portion of the road near the eastern terminus. Each is specific in respect of its particular subject, is designed to be controlling to that extent, and can be given full effect without impinging on the other. We regard them as accurately described, for present purposes, by saying: Both contemplate a connection with the main line of the Union Pacific as far westward as the 100th meridian; one expressly provides that this connection may be made farther westward, if the company deems a more westwardly connection more practicable or desirable, and the other merely requires that in locating the road east of the 100th meridian it shall be made to pass through, or only across the river from, Lawrence and Topeka, which are near the eastern terminus and in almost a direct line to the west.

And whilst the other provision in section 12, "and if the Union Pacific Railroad company shall not be proceeding in good faith to build the said railroad through the territories when the Leavenworth, Pawnee & Western Railroad company, now known as the Union Pacific Railroad Company, Eastern Division, shall have completed their road to the 100th degree of longitude, then the last-named company may proceed to make said railroad westward until it meets and connects with the Central Pacific Railroad company on the same line," if taken alone, gives rise to a like implication, the same is more than dispelled when the provision is contrasted with the clear and specific language of section 9, and particularly when due regard is had for the fact that the former does not lay any duty upon the company, in respect of the western terminus or otherwise, but only gives it, in a stated contingency, an option to proceed to a connection with the Central Pacific, instead of connecting with the Union Pacific. This option in no wise militated against the existence or exercise of the other option given in section 9.

So understood, as we think they must be, neither of the provisions in section 12 is in conflict with or operates to restrain the one in section 9.

The other branch of the contention has reference to the provision in the first section of the act of 1866, "provided, that said company shall be entitled to only the same amount of the bonds of the United States to aid in the construction of their line of railroad and telegraph as they would have been entitled to if they had connected their said line with

the Union Pacific Railroad on the one hundredth degree of longitude as now required by law," and turns upon the proper application and purpose of the concluding words "as now required by law." If they apply to and explain only what follows the subjunctive "if," as is asserted by the appellants, they indicate that Congress regarded the clear and explicit language of section 9 of the act of 1864 as meaningless; but if they apply to and explain the entire provision, as is asserted by the appellee, they indicate merely that Congress was being careful to perpetuate the requirement expressed in the other provision of section 9, "provided, further, however, that the bonds of the United States shall not be issued to such company for a greater amount than is hereinbefore provided, if the same had united with the Union Pacific Railroad on the 100th degree of longitude." The latter view is in our opinion the correct one. It properly accords to Congress a correct appreciation of prior legislation, which the former view does not do, and it also conforms to the settled rule that statutes couched in clear and explicit language are not to be deemed overthrown by possible, but not necessary, implications flowing from after legislation. Great Northern Ry. Co. v. United States, 84 C. C. A. 93, 109, 155 Fed. 945, 961; Oakes v. United States, 97 C. C. A. 139, 143, 172 Fed. 305, 309. These considerations persuade us that the provision in the act of 1866 has the same meaning as if it read: "Provided, that, as now required by law, said company shall be entitled to only the same amount of the bonds of the United States to aid in the construction of their line of railroad and telegraph as they would have been entitled to if they had connected their said line with the Union Pacific railroad on the one hundredth degree of longitude." And this view is strengthened by the succeeding provision. "And provided further, that said company shall connect their line of railroad and telegraph with the Union Pacific railroad, but not at a point more than fifty miles westward from the meridian of Denver in Colorado," because its terms, taken in their natural signification, are restrictive rather than creative or expansive, and are indicative of a purpose to limit or confine an existing option or privilege.

Finally, the appellants rely upon the recent decision in Union Pacific Railroad Co. v. Harris, 215 U. S. 386, 30 Sup. Ct. Rep. 138,[1] as definitely holding that the authority of the company to extend its road west of the 100th meridian was derived from the act of 1866, and not from the act of 1864. Of course, if that decision be as stated, it must be followed in this case. But it is not enough that it may contain language giving color to the appellants' contention, for to overcome the prior rulings in Missouri, Kansas & Texas Ry. Co. v. Kansas Pacific Ry. Co. and in United States v. Kansas Pacific Ry. Co., supra, it must appear that there was a purpose to depart from them. The facts in the Harris Case were these: In 1861 one Blou initiated a pre-emption claim to a tract of public land west of the 100th meridian by settling upon the tract and filing the requisite declaratory statement. In 1865 he transmuted the claim into a homestead entry (which he lawfully could do without breaking the continuity of the claim or losing the right to have the title when perfected relate back to the initiation of the claim. Ross v. Sinclair, Copp's Public Lands, 318; Watson v.

---

[1] 54 L. Ed. —.

Railway Co., 3 Landowner, 7; In re Edward Young, 9 Land Dec. Dep. Int. 32; Ames v. Bales, 17 Land Dec. Dep. Int. 547). In 1870 he made final proof under the homestead law, and in 1872 he received a patent. After the initiation of the claim and prior to the making of final proof, the railroad via Denver to Cheyenne was located and constructed across the tract, and thereafter a controversy arose as to whether a right of way thereover was granted by the Pacific Railroad acts. As the right of way granted by them was confined to "public lands," and as the tract was not in that category when any of those acts was passed or at any time thereafter, it would seem that the decision could not have been otherwise than against the railroad company, no matter which act authorized the extension of the road west of the 100th meridian. But in the opinion it is said:

"Any possible rights of the railroad company in this land commence with the act of July 3, 1866, for while the acts of 1864 and 1866 were in amendment of the act of 1862, yet the route prescribed by the acts of 1862 and 1864 was far to the east of this land, and only by the act of 1866 was the company authorized to construct a road through or near it. True, as held in (citing cases), the grant of the right of way is absolute, and takes effect as of the date of the grant. But that date must be found in an act prescribing the finally adopted route."

And yet the opinion does not mention the provision in section 9 of the act of 1864 or the earlier decisions wherein it was considered and held to be the source of the company's authority to extend its road west of the 100th meridian. This suggests that that provision and those decisions were not in the mind of the court when the opinion was rendered, and the suggestion becomes stronger when it is reflected that it is not at all the practice of that court to depart from its prior rulings either lightly or sub silentio. Not only so, but any element of improbability that otherwise might inhere in the suggestion is eliminated when it is stated, as is the case, that the provision in question appears at an obscure place in the act of 1864, that the prior rulings thereon were made more than 30 years ago, and that the printed brief for the railroad company in that case, a copy of which we have examined, made no mention of that provision or of those rulings. In these circumstances, we think it is not a fair inference from the opinion that there was any purpose to depart from those rulings (The Victory, 6 Wall. 382, 384, 18 L. Ed. 848; Langford v. Monteith, 102 U. S. 145, 147, 26 L. Ed. 53), and we therefore give effect to them.

It results, upon this record, that the appellee has a right of way 400 feet in width, being 200 feet on either side of the center line of its main track, across the tract in question, and that its title thereto must be regarded as effective from the date of the act of 1864, which preceded by almost two years the initiation of the title which the appellants are asserting.

But as the bill sought to have the title to the entire tract quieted in the appellants, and as the appellee did not disclaim so much thereof as is outside of this right of way, the decree, instead of dismissing the bill, should have recognized the appellee's title to the right of way and have quieted in the appellants the title to the remainder.

The decree as entered is reversed, with a direction to the Circuit

Court to enter a decree embodying the change just mentioned; the costs in this court to go against the appellee and those in the circuit court to be equally divided.