# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS THE CIRCUIT AND DISTRICT COURTS AND THE COMMERCE COURT

UNION PAC. R. CO. v. CITY OF GREELEY et al.†

SAME v. DENVER, L. & N. W. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. June 21, 1911.)

Nos. 3,483, 3,484.

**1. PUBLIC LANDS (§ 83*)—GRANT TO RAILROADS—RIGHT OF WAY.**

The effect of Act March 3, 1869, c. 127, 15 Stat. 324, authorizing the Union Pacific Railroad Company, Eastern Division, to adopt the roadbed of the Denver Pacific Railway & Telegraph Company between Denver and Cheyenne as a part of its line, and to grant to the Denver Company the perpetual use of its right of way, was to extend to such company the grant of right of way over the public lands 400 feet wide made to the Eastern Division by Act July 2, 1864, c. 216, 13 Stat. 356. That grant was an absolute grant in presenti, remaining as a float until the definite location or actual construction of the road, and, by virtue of the act of 1869, the Denver Company acquired title to such right of way over all lands which were public lands on July 2, 1864, and all persons acquiring title to, or rights in, any of such lands after that date took subject to such right of way. Reed, District Judge, dissenting.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 83.*]

**2. PUBLIC LANDS (§ 83*)—GRANT OF RAILROAD RIGHT OF WAY—CONSTRUCTION.**

The filing by the Union Pacific Railroad Company, Eastern Division, of a map of its general route, prior to the transfer of its rights to the Denver Company, required to obtain a tentative withdrawal of its land grant from sale or entry by the Interior Department, did not affect the grant of right of way, which, unlike the land grant, was subject to no conditions that the lands should be free from homestead or other claims at the date of definite location of its line, but was absolute.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 83.*]

**3. PUBLIC LANDS (§ 79*)—GRANT OF RAILROAD RIGHT OF WAY—CONSTRUCTION—ADVERSE RIGHTS.**

A mere settlement upon a tract of public land does not initiate any right in the settler which will defeat a subsequent grant of right of way over such land to a railroad company, but his rights in that respect at most could only date from the time he filed his declaratory statement.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 244–246; Dec. Dig. § 79.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

189 F.—1                     † Rehearing denied.

4. EMINENT DOMAIN (§ 280*)—EQUITABLE ESTOPPEL—RIGHTS WHICH MAY BE ACQUIRED. .

Property which can be acquired by the exercise of the power of eminent domain may be acquired for the same public use by the application of the doctrine of equitable estoppel.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 280.*]

5. RAILROADS (§ 82*)—RIGHT OF WAY THROUGH PUBLIC LANDS—ACQUIES-CENCE IN OCCUPANCY BY OTHER CORPORATIONS.

The predecessor in interest of complainant railroad company obtained by grant from Congress right of way for its road 400 feet wide through the public lands, and also title to every alternate section of such lands under the same grant. Certain of such lands were sold under its authority to a colony. and conveyed by deed; reserving a right of way of 200 feet. The colony also acquired title to adjoining lands and conveyed to the company a right of way over the same 100 feet wide, with 100 feet additional for station grounds, which conveyance was accepted by the company. The colony then laid out and platted on its lands what is now the defendant city of Greeley, with streets and blocks extending to the 100 and 150 feet right of way, and such streets were improved and the lots sold and fenced and improved by the purchasers. From time to time during 40 years complainant and its predecessors purchased and paid for lots within the 400 feet limits of the original right of way, and also obtained from the city franchises to use streets thereon. Various other railroad companies also obtained franchises, and purchased and occupied with their lines and buildings lots within such limits, one of which was organized and owned and controlled by complainant's predecessor. Held that, as against the city and such other public service corporations having the power of eminent domain, complainant was estopped to assert title to or right of way over, the lands lying outside of the 100 and 200 feet limits in which it had acquiesced for such length of time. Sanborn, Circuit Judge, dissenting.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 82.*]

Appeals from the Circuit Court of the United States for the District of Colorado.

Suit in equity by the Union Pacific Railroad Company against the City of Greeley and others, and against the Denver, Laramie & Northwestern Railway Company. Decree for defendants in each case, and complainant appeals. Affirmed.

Clayton C. Dorsey (Wm. V. Hodges and N. H. Loomis, on the brief), for appellant. .

Henry McAllister, Jr., E. E. Whitted, and A. D. Quaintance (Joseph C. Ewing, F. J. Green, John D. Milliken, Joseph C. Helm, James E. Kelby, Joel F. Vaile, and William N. Vaile, on the brief), for appellees. .

William P. Malburn (Charles S. Thomas, W. H. Bryant, and George L. Nye, on the brief), amici curiæ.

Before SANBORN, Circuit Judge, and W. H. MUNGER and REED, District Judges. .

W. H. MUNGER, District Judge. These suits involve the same question. They were commenced by complainant in the court below to remove clouds upon the title to its alleged right of way through certain tracts of land in Weld county, Colo. (between Denver in that state and Cheyenne, Wyo.), and to procure injunctions prohibiting any

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

interference with the full use and enjoyment of such claimed right of way. Complainant claims a right of way 400 feet in width through the tracts in question by virtue of the grant of right of way by Congress to the Union Pacific Railroad and its branches. The respondents deny that complainant has a right of way through the tracts of land in question 400 feet in width by virtue of any act of Congress, and farther allege certain facts as an estoppel.

[1] In the determination of the case it becomes important to first inquire what right of way, if any, was granted by Congress through the lands in question.

July 1, 1862, Congress passed the first of the Pacific Railroad acts under which complainant bases any right. Act July 1, 1862, c. 120, 12 Stat. 489. This act in brief provided for the incorporation of the Union Pacific Railroad Company and the construction of a railroad commencing at the one-hundredth meridian in Nebraska, between the south margin of the valley of the Republican river and the north margin of the valley of the Platte river, and extending to the western boundary of Nevada; also authorized the construction of certain branch lines, commencing at the Missouri river, to connect with the main line at the one-hundredth meridian. This act granted to said main line and branches a right of way over the public lands of the United States 400 feet in width, and, to aid in the construction of the roads, granted five alternate sections of public lands designated by odd numbers within the limits of ten miles on each side of each of said roads, which had not been sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim had not attached at the time the line of said road should be definitely fixed. An exception was also contained as to mineral lands. To aid further in the construction, a grant of bonds was made. The act provided also that, upon the acceptance of the act by the company, and the filing of a map within two years of the passage of the act, designating the general route of said road as near as might be, the Secretary of the Interior should cause the lands within 15 miles of said designated route to be withdrawn from pre-emption, private entry, and sale, thus affording the company protection in its grant of lands from subsequent disposition by sale, pre-emption or homestead entry in case of a deviation or variation between the general and finally adopted route to the extent of 5 miles on each side of the line of general route. By the ninth section of the act, the Leavenworth, Pawnee & Western Railroad Company was designated as one of the branches, given the benefit of the same grant of right of way and lands in aid of its construction, such branch road to connect with the main line at the one-hundredth meridian. These respective grants were made subject to the right to the use of the said roads by the government for postal, military and other purposes, the particulars in respect to which it is unnecessary here to specify.

The grant of the right of way and of the aid lands were each in presenti. The grant of the right of way differed from the grant of lands in this: The grant of right of way was absolute, containing no reservations or exceptions, while as to the alternate sections

of land, it excepted from the grant the lands which had been "sold, reserved or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed." These grants, while in presenti and effective from the date of the passage of the act, remained as a float until the filing of the map of the definite location. Upon the filing of the map of the definite location, the grant became fixed and definite. As to the right of way, parties who, after the passage of the act and before the map of definite location was filed, acquired any of the public lands by purchase, pre-emption or homestead entry, took the same subject to the right of way being definitely located thereon. R. R. Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578.

The act contained the following provision:

"And the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said road and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefit of the same for postal, military and other purposes, Congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend or repeal this act."

As the right of way claimed by complainant in these cases is based upon the grant to the branch line designated as the Leavenworth, Pawnee & Western Railroad Company, we shall deal with the amendatory acts only to the extent that that branch was affected.

On July 2, 1864, Congress passed an act (Act July 2, 1864, c. 216, 13 Stat. 356) amending the act of July 1, 1862. This amendatory act doubled the land grant by giving to the roads ten of the alternate sections on each side of the line thereof, subject to the same exceptions as in the original act, and directed the withdrawal by the Secretary of the Interior of the lands within the limits of twenty-five miles on each side of the road upon the filing of a map showing the general route. Section 9 of the amendatory act contained this provision:

"That any company authorized by this act to construct its road and telegraph line from the Missouri river to the initial point aforesaid may construct its road and telegraph line so as to connect with the Union Pacific Railroad at any point westwardly of such initial point, in case such company shall deem such westward connection more practicable or desirable; and in aid of the construction of so much of its road and telegraph line as shall be a departure from the route hereinbefore provided for its road such company shall be entitled to all the benefits and be subject to all the conditions and restrictions of this act."

It farther provided, however, that the branch lines should not receive bonds from the United States to aid in the construction of such portion of the road as should be extended to a connection with the Union Pacific Railroad west of the one-hundredth degree of longitude. The Leavenworth, Pawnee & Western Railroad Company in the meantime changed its name to the Union Pacific Railroad Company, Eastern Division. By this amendatory act the grant of the right of way and the alternate sections in aid of the construction of the road was extended over the public lands west of the one-hundredth meridian,

continued as a float as under the original act until the definite location of the road. Mo., Kas. & Texas Ry. Co. v. Kas. Pac. Ry. Co., 97 U. S. 491–494, 24 L. Ed. 1095; U. S. v. Kas. Pac. Ry. Co., 99 U. S. 455–457, 25 L. Ed. 289; Stuart v. U. P. R. Co., 178 Fed. 753, 103 C. C. A. 89.

We are cited to the case of U. P. R. Co. v. Harris, 215 U. S. 386, 30 Sup. Ct. 138, 54 L. Ed. 246, as holding that the grant of the right of way west of the one-hundredth meridian did not take effect until the passage of the subsequent act of July 3, 1866 (Act July 3, 1866, c. 159, 14 Stat. 79). That case and the effect of the decision was fully considered by this court in Stuart v. U. P. R. Co., supra. In the opinion written by Mr. Justice Van Devanter, then Circuit Judge, the Harris Case was by him analyzed. With that opinion we are now content.

The act of 1866 extended the time to designate the general route of the road and to file a map thereof until the 1st day of December, 1866, and provided that its connection with the main line of the Union Pacific should not be at a point more than fifty miles westwardly from the meridian of Denver in Colorado. This act of 1866 contained no grant of lands or right of way; simply extended the time in which to file the map showing the general route of the road and fixed the most westwardly point at which it could connect with the main line of the Union Pacific. Such being our interpretation of the before-mentioned acts of Congress, it follows that the grant of the right of way, after the passage of the act of July 2, 1864, existed as an inchoate right over any of the public lands, west of the one-hundredth meridian to any point upon the main line of the Union Pacific which might be selected by the Union Pacific Railroad Company, Eastern Division. If, then, the lands in question were unappropriated public lands on July 2, 1864, the company's right to construct its road over the same and obtain a right of way 400 feet in width is undeniable and the subsequent entry of the lands by individuals under the land laws of the United States was subject to such inchoate right being exercised by the company.

In the meantime, in the year 1867, the Denver Pacific Railway & Telegraph Company incorporated under the laws of the state of Colorado and prior to March 3, 1869, located and graded a line of road from Denver to a connection with the main line of the Union Pacific at Cheyenne, Wyo. That road not having a right of way over the public lands, Congress by an act passed March 3, 1869 (Act March 3, 1869, c. 127, 15 Stat. 324), authorized and empowered the Union Pacific Railroad Company, Eastern Division, to contract with the Denver Pacific Railway & Telegraph Company for the construction, operation, and maintenance of that part of its line of railroad and telegraph between Denver and the connection with the main line of the Union Pacific at Cheyenne, to adopt the roadbed already graded by said Denver Pacific Railway & Telegraph Company as its line, and to grant to Denver Pacific Railway & Telegraph Company the perpetual use of its right of way and depot grounds, and to transfer to it all the rights and privileges, subject to all the obligations pertaining to said part of its line, and all the provisions of law for the

operation of the Union Pacific and its branches and connections as a continuous line should apply the same as if the road from Denver to Cheyenne had been constructed by the said Union Pacific Railroad Company, Eastern Division, but the Union Pacific Railroad Company, Eastern Division, was not authorized to fix the rates of tariff for the Denver & Pacific Railway & Telegraph Company. The two companies, the Union Pacific Railroad Company, Eastern Division, and the Denver Pacific, were authorized to mortgage their respective portions of said road for an amount not exceeding $32,000 per mile to enable them respectively to borrow money to construct the road, and each of the companies should receive patents to the alternate sections of land along their respective lines of road in like manner and within the same limits as then provided for by law in case of lands granted to the Union Pacific Railway Company, Eastern Division. This act, in the case of U. S. v. U. P. Ry. Co., 148 U. S. 562, 13 Sup. Ct. 724, 37 L. Ed. 560, was construed not as a new and independent grant, but as a continuation of the grant before made to the Union Pacific Railroad Company, Eastern Division, and an adoption of the grade of the Denver Pacific Railroad Company between Denver and Cheyenne, as a part of the continuous line of the Union Pacific, Eastern Division, from the Missouri river to its connection with the main line at Cheyenne.

As we have before said, the grant of the lands and the right of way was an inchoate right, consisting of a float, until the line was definitely fixed between Denver and Cheyenne over the route then graded by the Denver Pacific Company, and in the case of U. S. v. U. P. Ry. Co., supra, it was specifically held that this inchoate right to that portion of the land grant was transferred to the Denver Pacific Company. If the inchoate right to the granted lands could be transferred by authority of Congress we perceive no reason why the inchoate right to the right of way could not also be thus transferred.

[2] The road filed a map after the passage of the act of July 2, 1864, showing the general route of its line forming a connection with the main line at the one-hundredth meridian, and after the passage of the act of 1866 it filed another map showing the general route to Denver, thence northerly along the South Platte river to the Cache le Poudre river, thence westerly to a point near what is now Ft. Collins, the main line of the Union Pacific not having at that time been constructed that far westerly; the exact point of junction could not be determined. We regard the filing of the map of general route unimportant in the determination of this controversy. A map showing the general route of the proposed line of road was a requirement for the purpose of enabling the Interior Department to withdraw from disposition lands which might accrue to the Company under the grant of alternate sections. As to the right of way, that remained a float until the filing of a map of definite location or, without such map, until the actual construction or completion of sections of the road and acceptance thereof by the government. Then only did the right of way become fixed, definite, and certain. The language of the several acts plainly distinguishes the difference in this respect between the grant of

the right of way and the grant of lands. Bybee v. O. & C. R. Co., 139 U. S. 663, 11 Sup. Ct. 641, 35 L. Ed. 305; U. S. v. Southern Pac. R. Co., 146 U. S. 570–599, 13 Sup. Ct. 152, 36 L. Ed. 1091; Nielsen v. Northern Pac. R. Co. (C. C. A.) 184 Fed. 601.

[3] We next proceed to ascertain if the lands in question were, on the 2d of July, 1864, public lands. The only claim made that at that date any portion of the lands had been withdrawn from the category of public lands is based upon the fact that one Andrew Lemon on June 23, 1865, filed in the local land office his declaratory statement under the pre-emption laws as to a portion of the lands. In such declaratory statement he alleged his settlement upon the land as of May 1, 1864, it thus appearing that, while his settlement antedated the passage of the act of July 2, 1864, he filed no declaration of claim in the land office until nearly one year after the passage of that act. The mere settlement upon the land did not initiate in him any right which defeated the grant of right of way. His rights in that respect at most could only date from the time he filed his declaratory statement in the local land office. Northern Pac. R. Co. v. Colburn, 164 U. S. 383, 17 Sup. Ct. 98, 41 L. Ed. 479; Russian-American Packing Co. v. U. S., 199 U. S. 570, 26 Sup. Ct. 157, 50 L. Ed. 314.

The question remains to be considered whether the complainant is now estopped from asserting a claim as against respondents to the right of way over such lands the full width of four hundred feet. The facts upon which the claim of estoppel is based may be briefly summarized as follows:

After the passage of the act of March 3, 1869, and under date of March 19, 1869, the Union Pacific Railway Company, Eastern Division, and the Denver Pacific Railway & Telegraph Company entered into a contract in writing, whereby the Denver Pacific Railway & Telegraph Company completed a line of road between Denver and Cheyenne, and the Union Pacific Railway Company, Eastern Division, transferred to it its grant of right of way and aid lands acquired under the before-mentioned acts of Congress. The road between Denver and Cheyenne was constructed, and the commissioners appointed to examine and report to the President made a report showing the construction of the road, which report was accepted by the President of the United States and the Secretary of the Interior. Under date of August 10, 1869, the Denver Pacific Railway & Telegraph Company executed upon all its property, including the right of way and the odd-numbered sections granted to aid in the construction of the road, a mortgage or trust deed, to secure an issue of bonds, in the sum of $2,500,000. The trustees therein named qualified and under the terms and authority given by said mortgage or trust deed executed and acknowledged their written authorization and power of attorney to John Evans, one of their number, authorizing him to make conveyances of any of the mortgaged property upon request of the Denver Pacific Railway & Telegraph Company, such power being authorized by the laws of the then territory of Colorado and the terms of the trust deed. Pursuant to the authority given in said deed of trust, John Evans, as trustee, duly conveyed, on or about the 13th day of April, 1870, to

Horace Greeley, as trustee, in trust for Nathan C. Meeker, Robert A. Cameron, Henry T. West and their associates, known and designated as the Union Colony, section 17 and a portion of section 5, which included a part of the lands in controversy in this action, reserving as the right of way of the railway company a strip only 200 feet in width.

In the year 1870, a committee, representing an association of persons desirous of settling in the territory of Colorado, selected the site of the present city of Greeley and the surrounding country as the location for such settlement, and duly incorporated the Union Colony of Colorado under the laws of the then territory of Colorado. That immediately upon the incorporation of the Union Colony, it acquired by good and sufficient warranty deeds of conveyance from the respective entrymen and patentees the title other than that of the Denver Company to a right of way, if any, to all of the lands involved in this controversy, together with other lands. None of the deeds to the Union Colony for any of such lands contained reservations of any character of any right of way of the Denver Pacific Railway & Telegraph Company or any other company, excepting the tract before mentioned conveyed by Evans, trustee, although the Denver Pacific Railway & Telegraph Company had constructed its road over the premises prior to the acquisition of title by the Union Colony Company. After so acquiring title, and before August 23, 1870, the Union Colony surveyed and platted into blocks, lots, streets, alleys and avenues, the town (now city) of Greeley and duly filed with the county recorder of Weld county its plat, and on the 21st day of October, 1870, the Union Colony made, executed and delivered to the Denver Pacific Railway & Telegraph Company a right of way of 50 feet on each side of the center line or track of said Denver Pacific Railway & Telegraph Company through said town of Greeley, the entire width of said right of way being 100 feet, commencing at the southeast corner of the town plat of said town of Greeley and running north through blocks 101, 100, 82, 79, 62, 39, 22, 19 and 2, as platted, and a right of way of 200 feet along the line or track of said railway company within blocks 42 and 59, being one hundred and fifty feet through said blocks on the east side of said railway company's track and fifty feet on the west side, said two hundred foot strip being for depot grounds and depot purposes, and in said deed said Union Colony agreed to lay out and construct along and east of said right of way a street sixty-six feet wide, running north and south within said blocks 42 and 59, and the railway company, in consideration of said deed, agreed to erect within three months from the date thereof a good and substantial building for a freight and passenger depot.

The Union Pacific Railway Company, Eastern Division, pursuant to an act of Congress of March 3, 1869 (15 Stat. 348), changed its name to Kansas Pacific Railway Company, and in January, 1880, the Union Pacific Railroad Company (main line), the Kansas Pacific Railway Company, and the Denver Pacific Railway & Telegraph Company entered into articles of consolidation, forming a new and consolidated company under the name of "the Union Pacific Railway Company," which acquired all the right and interest of the three com-

panies in the respective roads. The Union Pacific Railway Company made purchases of portions of lots lying within the claimed 400-foot right of way from the grantees of the Union Colony, paying valuable considerations therefor as follows: March 3, 1886, from Henry Hoyt; March 15, 1886, from Joseph Joyce; under date of August 11, 1900, the complainant, Union Pacific Railroad Company, from James M. Freeman and Emma Freeman; on October 25, 1901, the complainant, Union Pacific Railroad Company from the Greeley Sugar Company. All of said deeds were by the Union Pacific Railway Company duly filed for record, and the railway company for the first time went into actual possession and occupancy of said lands. At various times complainant and its predecessors in title, being desirous of constructing, maintaining and operating various railroad tracks upon certain streets, avenues, alleys, and public places in Greeley, within the now claimed 400-foot right of way, applied to the board of trustees of the town of Greeley, and the city council of the city of Greeley, after the town became a city, for the right and privilege so to do, and said bodies did thereupon under the laws of the state of Colorado, enact certain ordinances to that end, which were duly approved by the mayor, and thereafter the complainant and its predecessors accepted said ordinances and grants, and did construct, maintain, and operate, and complainant is now maintaining and operating, the tracks authorized by said ordinances. Such ordinances, according to their respective numbers, their respective dates of approval, and the names of the respective grantees therein designated, are:

Ordinance No. 50, approved March 16, 1886, to the Union Pacific Railway Company (complainant's predecessor).

Ordinance No. 102, approved September 17, 1901, to Union Pacific Railroad Company (complainant).

Ordinance No. 104, approved December 5, 1901, to Union Pacific Railroad Company (complainant).

Ordinance No. 107, approved May 20, 1902, to Union Pacific Railroad Company (complainant).

Ordinance No. 111, approved December 2, 1902, to Union Pacific Railroad Company (complainant).

Ordinance No. 191, approved June 15, 1909, to Union Pacific Railroad Company (complainant).

Under the laws of the state of Colorado in effect during the year 1909, the city council of Greeley had no power to grant the use of, or the right to lay down any railroad track in any street to complainant except upon the written consent of the owners of the land, representing more than one-half of the frontage of the street, or so much thereof as was sought to be used for railroad purposes. Under the statute complainant did, prior to the passage of said Ordinance No. 191, file with the city council of Greeley the written consent of the owners of land representing frontage of the streets sought to be used for its railroad purposes under said ordinance. All the persons signing such consent were grantees of and claimed title as the owners of lots fronting on said street and derived their title under the Union Colony.

Immediately after the making and filing by the Union Colony of the

town plat before mentioned in 1870, said Union Colony began to sell and dispose of the lots, blocks, and parcels of land except streets, avenues, and alleys shown thereon, including all the lots, blocks and parcels of land abutting upon lines drawn 50 feet distant from and parallel to and on either side of the center line of the track of the Denver Pacific Railway & Telegraph Company, except the additional strip 100 feet wide through blocks 42 and 59 conveyed to the company as before stated for depot purposes.

Prior to the year 1874 the Union Colony had sold and conveyed by bargain and sale deeds which made no exceptions of or reference to any reserved railroad right of way, practically all of the said lots, blocks and parcels of land abutting upon said 100-foot right of way strip, and prior to the year 1880 the Union Colony had so sold and conveyed all of the said land, including all of the land now claimed to be owned by the respective respondents herein, lying within the 400-foot strip now claimed by complainant and outside of the 100-foot strip. Such sales were made to a large number of persons for good and valuable considerations, in reliance upon said title of the Union Colony and without knowledge of any claim of the Denver Pacific Railway & Telegraph Company to any portion thereof, and their conveyances were forthwith recorded in the office of the recorder of Weld county. Such deeds purported to convey the fee-simple title to the respective parcels of land described therein. The purchasers of said lands thereupon entered into the actual and exclusive possession, occupancy and use of the respective parcels of land so conveyed to them, and thereafter, from time to time, such lots, blocks, and parcels of land passed by deed of conveyance, for valuable considerations, from party to party, none containing any exceptions or reservations as to any right of way of the Denver Pacific Railway & Telegraph Company and its successors. The grantees of the Union Colony, from time to time, made, executed, and delivered mortgages or trust deeds upon their respective lots and lands, the same covering or affecting lots or parcels of land wholly or partly within the 400-foot strip now claimed by complainant but outside of the 100-foot strip, and upon many of said lots and parcels of land, partly or wholly within said strip, buildings and other structures, both residence and business, some large and extensive, have been erected by such grantees and occupied by them for their respective purposes, upon the faith of their respective titles under the Union Colony. The total of all such improvements so placed upon any or all of the premises on either side of the 100-foot strip and lying within said claimed 400-foot strip within said city aggregate at least $250,000, many of such buildings and improvements upon such property still standing upon the said property. Many of such grantees of the Union Colony, shortly after their purchase of said properties, erected around the boundaries of the same, and particularly along the line of the 100-foot strip, fences or other boundary monuments, and the Denver Pacific Railway & Telegraph Company and its successors, including complainant, have from time to time erected and maintained their own fences along the same line, and in the business portion of the city of Greeley buildings have been erected along such line. Such

private fences were constructed from 30 to 40 years ago and still remain along such line. Complainant herein, nor any of its predecessors in title, have used or occupied any portion of said lots or lands outside of the said 100-foot strip excepting only certain lots or parcels of land which the complainant or its predecessors in interest purchased from grantees of the Union Colony, as before specified, and excepting tracks laid upon streets, avenues, or alleys of the city under ordinances or franchises from said town.

The city of Greeley from time to time granted rights and privileges to various parties to construct telegraph, telephone, electric light and power lines and gas mains and pipes, over, under, and along such streets and alleys and portions thereof lying within such claimed 400-foot strip, and said railway tracks, lines, mains, and pipes have been constructed in pursuance thereof; some for 21 years. The city of Greeley has, from time to time since 1889, laid, constructed, maintained, and is now maintaining, its municipal water and sewer pipes and appurtenances, through, under, and along such claimed 400-foot strip and the railway tracks and along divers of such intersecting streets, avenues, and alleys, and the various grantees of the Union Colony, in occupation and possession of the various lots and parcels of land abutting upon the 100-foot strip have connected their respective buildings with such mains and pipes for water and sewer purposes. All of the foregoing rights and privileges were granted, and all of said lines and tracks were laid, and all of said water and sewer mains and pipes and connections therewith were constructed and maintained without any protest or objection upon the part of complainant or its predecessors until shortly before the commencement of this suit.

In January, 1881, the Greeley, Salt Lake & Pacific Railway Company was incorporated under the laws of the state of Colorado for the purpose of operating a line of railroad from Greeley in a westerly direction. Said corporation was created by persons interested in and connected with the Union Pacific Railway Company, Sidney Dillon being the president of both railroads, and the stock of the Greeley, Salt Lake & Pacific Company was, at the time of its organization, and for many years afterwards, owned and controlled by or in the interest of the Union Pacific Railway Company. Said Greeley, Salt Lake & Pacific Company immediately after its organization applied to the board of trustees of the town of Greeley for permission to construct and operate its track across, along and over certain streets and alleys and other public places in the town of Greeley, and ordinances were passed granting such right, and the said Greeley, Salt Lake & Pacific Company also purchased right of way from various lot owners and condemned other property, for right of way, all within complainant's claimed 400-foot right of way, but outside of the 50 feet from the center of its main track. All of such titles by purchase and condemnation proceedings and by such ordinances were procured and accepted by said Greeley Company while the same was under the control and ownership of the Union Pacific Company, and the said Greeley, Salt Lake & Pacific Company constructed its road along and over such lands and within the claimed 400-foot right of way, and said Greeley, Salt Lake & Pa-

cific Company, about the 1st of June, 1883, executed and delivered to Frederick L. Ames and Ezra H. Baker (who were then directors of the Union Pacific Railway Company) as trustees, its certain mortgage or deed of trust, wherein and whereby the said Greeley, Salt Lake & Pacific Company conveyed to the said Ames and Baker, for the purpose of securing an issue of bonds by said Greeley Company, all of the railroad property and franchises of its said company, together with all rights of way and easements acquired or owned or which it might thereafter at any time acquire or own, for the purpose of right of way, and all depots and other houses, structures and fixtures of the Greeley, Salt Lake & Pacific Company.

On the 18th of March, 1890, the Union Pacific Railway Company, still owning or controlling the stock and bonds of the Greeley, Salt Lake & Pacific Company, caused the said company, with divers other Colorado railroad corporations, whose stock or bonds were then controlled or owned by the Union Pacific Railway Company, to be consolidated under the statutes of Colorado into the Union Pacific, Denver & Gulf Railway Company, and the Union Pacific Railway Company continued to be the owner, and in control of the stock and a large amount of bonds, of the consolidated Gulf Company, until the subsequent appointment of receivers hereinafter mentioned. After the consolidation of said companies into the Union Pacific, Denver & Gulf Railway Company said company executed and delivered to the American Loan & Trust Company of Boston its mortgage or deed of trust, to secure an issue of its bonds, upon all of the property, right of way, etc., of such Gulf Company, and a requisite portion of the bonds of said Union Pacific, Denver & Gulf Railway Company were exchanged for the first-mortgage bonds formerly issued by the Greeley, Salt Lake & Pacific Company, at the time of said consolidation outstanding, said bonds of the Greeley Company being then owned by the Union Pacific Company. That by virtue of such exchange of securities all of the bonds · of the Greeley, Salt Lake & Pacific Railway Company passed into the treasury of the Union Pacific, Denver & Gulf Railway Company and by it pledged as collateral security for its bonds.

In November, 1894, the then trustees in the mortgage before mentioned by the Denver Pacific Railway & Telegraph Company to John Edgar Thompson, Adolphus Meier and John Evans, as trustees, instituted a suit in the Circuit Court of the United States for the district of Colorado, to foreclose said mortgage. Receivers were appointed, who took possession and operated said road, and such proceedings were had therein that a decree of foreclosure was entered directing the sale of the mortgaged premises, and the master directed to make the sale, which he did, in March, 1898. By such sale complainant became the purchaser and received a deed for the mortgaged premises, which was duly confirmed by the court in May, 1898. In the latter part of October or first of November, 1894, the American Loan & Trust Company, as trustee, filed a bill in the Circuit Court of the United States for the district of Colorado, to foreclose the mortgage before mentioned, executed by the Union Pacific, Denver & Gulf Railway. Receivers were appointed and such proceedings had therein that a decree of foreclo-

sure and sale was entered and the property of said Union Pacific, Denver & Gulf Railway Company was sold on the 16th day of November, 1898, by the master, to J. Kennedy Tod, Henry Budge, and E. C. Henderson. Said sale was confirmed by the court, and in December, 1898, the purchasers conveyed the same to the Colorado Southern Railway Company, which company has since been in the possession of and operating said road.

Certain fundamental rules of estoppel are stated by text-writers as follows:

"It is a fundamental rule of law that, where a party's declaration or conduct has induced a third party to act in a particular manner, he will not afterwards be permitted to deny the truth of the admission if the consequences would be to work an injury to such third person or to someone claiming under him. * * * The doctrine of estoppel is applied to promote justice and fair dealing." 2 Beach on Modern Equity Jurisprudence, § 1092.

"A person who negligently and culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict cannot afterwards dispute that fact in an action against the person whom he himself assisted in deceiving." Bigelow on Estoppel, 565.

"He who is silent when conscience requires him to speak shall be debarred from speaking when conscience requires him to keep silent." 2 Herman on Estoppel, § 937.

"Where a party negligently and culpably stands by and allows another to contract on the faith of an understanding which he can contradict, he is afterwards estopped from disputing the facts in an action against the person whom he has assisted in deceiving, upon the principle that between innocent parties he who causes the injury must suffer." Section 938, Id.

"The principle that one should be estopped from asserting a right to property upon which he has by his own conduct misled another, who supposed himself to be the owner, to make expenditures, is often applied where one owning an estate stands by and sees another erecting improvements on it in the belief that he has the title or an interest in it, and does not interfere to prevent the work or inform the party of his own title. There is in such conduct a manifest intention to deceive or such gross negligence as to amount to constructive fraud." Section 975, Id.

In Wendell v. Van Renssalaer, 1 Johns. Ch. (N. Y.) 344–354, Chancellor Kent stated the rule as follows:

"There is no principle better established in this court nor one founded on more solid considerations of equity and public utility than that which declares that, if one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel."

Among the cases which recognize and fully sustain the foregoing principles are Trenton Banking Co. v. Duncan, 86 N. Y. 221; Anderson v. Armstead, 69 Ill. 452; Pence v. Arbuckle, 22 Minn. 417; Morgan v. Railroad Co., 96 U. S. 716, 24 L. Ed. 743; Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79; Evans et al. v. Snyder et al., 64 Mo. 516.

But it is claimed, on authority of Northern Pacific Railway Co. v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044, and Union Pacific R. Co. v. Kindred, 168 Fed. 648, 94 C. C. A. 112, that these

well-established and now elementary principles of estoppel as to ordinary property rights are not applicable in those cases for the reason that, Congress having granted the right of way for a public purpose, the grant cannot be impaired by alienation or otherwise. Whether these principles of estoppel could be applied for the benefit of a private use we need not now inquire. Each of the respondents are public corporations, in whose behalf the police power of the state could be exercised to condemn a necessary part of complainant's right of way for public use to an extent which would not prevent complainant from fully performing its duty to the public, and it would seem to be a reasonable and just rule to say that property which can be acquired by the exercise of the power of eminent domain may be acquired for the same public use by the application of equitable estoppel. [4] The decisions in the cases of Northern Pacific Railway Co. v. Townsend, and Union Pacific R. Co. v. Kindred, supra, in no respect conflict with such view. In those cases the question involved was simply whether a portion of the right of way could be acquired by a private person for an exclusively private use by an application of the doctrine of adverse possession. No principle of estoppel was involved or applicable to the facts in either of those cases.

In Northern Pacific Railway Co. v. City of Spokane, 64 Fed. 506, 12 C. C. A. 246, which involved the question of the dedication of a public road across the right of way, it was said:

"The nature of the right of way over public lands, which the railroad company obtained by the grant, was not different from that which it acquired over private lands by purchase or by condemnation proceedings under the laws of the several states through which it passed. Whether the company acquired the fee to the lands covered by its right of way or not, no reason is apparent why it may not dedicate public easements over and across the same and by its own act grant to the public all the rights which the latter may obtain by the exercise of its right of eminent domain. * * * It has been held that trustees holding lands for public uses, and corporations having public duties, may dedicate to public use for highways, when such use is not inconsistent with the purposes for which the lands were vested in trust or incompatible with the duties required."

North Coast Ry. v. Northern Pac. Ry. Co., 48 Wash. 529, 94 Pac. 112, was a case in which plaintiff sought to condemn a portion of defendant's right of way longitudinally. In that case it was contended that no part of the right of way was subject to appropriation by any other railroad company, such contention being based upon the theory that Congress, in granting the right of way of 400 feet in width, conclusively determined that such width was necessary for the public purposes of the grant, basing the claim upon the decision in Northern Pacific Railway Co. v. Townsend, supra. The court, after quoting from the language in Northern Pac. Ry. Co. v. Townsend, said:

"It will be observed from the language quoted that the court had under consideration a question of title claimed through adverse possession by an individual for private purposes; and it was stated in unmistakable language that in such a case the courts cannot say that the full amount of the original grant is no longer needed. Such a case, involving only individual and private considerations, is very different from one which involves public necessities. In order that it might be clearly understood that the court recognized such a necessary distinction, the following language was used in the same

opinion: 'Of course, nothing that has been said in any wise imports that a right of way granted through the public domain within a state is not amenable to the police power of the state. Congress must have assumed when making this grant, for instance, that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed. But such limitations are in no sense analogous to claim of adverse ownership for private use.' It seems clear from the quotation last made that the federal Supreme Court recognizes the power of the state to determine whether the whole of a right of way which has been created by federal grant through an act of Congress is actually needed as against the requirements of the public service which arise with the increase of commerce and transportation necessities. It has been repeatedly held by this court that the power exists in this state when public necessity requires it for one railway or public service corporation to condemn a part of the right of way of another railway company or public service corporation which is not necessary for the exercise of the latter's franchise. (Citing authorities.) It has also been repeatedly held by other courts that a right of way of a railroad company which has been acquired for that express purpose through a federal grant is not exempt from the operation of state laws of eminent domain. (Citing authorities.) It is true the most, if not all, of the last-cited cases related to crossings of other railroads over a right of way acquired by federal grant, whereas, the tract here sought is not for mere crossing purposes, but is a longitudinal tract, about three-fifths of a mile in length, to be carved out of claimant's right of way. The principle as to the power of eminent domain is, however, the same in both cases, depending upon the necessities of the occupying railroad and those of the public service. This court has held that a longitudinal portion of a right of way may be condemned by another railway corporation where the occupying railway does not actually need it, and where it is needed by the other in the interest of the public service."

[5] That complainant's right of way was acquired by virtue of an act of Congress does not exclude, under a proper state of facts, the doctrine of equitable estoppel, we think recognized by the court in Spokane & British Columbia Ry. Co. v. Washington & Great Northern Ry. Co., 219 U. S. 166, 31 Sup. Ct. 182, 55 L. Ed. 159, heard on error from the Supreme Court of the state of Washington, a case involving rights under a grant by Congress of a railroad right of way, the court refusing to consider the question of estoppel for the reason that that was not a federal question.

In the case before us, the Greeley, Salt Lake & Pacific Railway Company was given life by action on the part of the Union Pacific Railway Company (complainant's predecessor), and given a permanent situs upon a portion of its unused and unrequired right of way. It was started in its operation as a public carrier by the Union Pacific Railway Company, its property represented to include such unused and unrequired portion of the right of way mortgaged by officers of the Union Pacific Railway Company. Through the foreclosure of such mortgage respondent, Colorado & Southern Railway Company, acquired its rights. To permit complainant to now come into a court of equity and successfully invoke the court's aid by a decree holding that the Colorado & Southern Railway Company is a mere licensee would be to sanction a most palpable fraud.

The respondent, the Greeley & Denver Railway Company owns and operates a line of road from Denver to Greeley and operates and

maintains its street railroad over and along certain of the streets and avenues of said city of Greeley, and in March, 1908, the city council of the city of Greeley granted to it a franchise to construct and operate its right of way over and across certain of the streets of the city of Greeley. The portions of its line of road which encroaches upon complainant's claimed 400-foot right of way is the portion on Seventh avenue from the south side of Tenth street to the north side of Seventh street in said city, and the only portion within the 100-foot strip is where it crosses complainant's right of way on Third street practically at right angles. The Greeley & Denver Railway Company has expended large sums of money in the construction and equipment of its road in the full faith and belief that said streets were properly and legally laid out and used by the public as such for some 40 years, and had no actual knowledge that complainant claimed any interest outside of the 100-foot right of way until about the time of the commencement of this action; that the ordinance of March, 1908, by which it, the Greeley & Denver Railway Company, was authorized to construct its road over certain of the streets and alleys of the city was published as required by law and that the acts and doings of said respondent, in constructing its track along said streets and avenues were well known to the general public, and complainant had knowledge of such construction work on Seventh avenue but made no complaint to said Greeley & Denver Railway Company until it commenced the construction of its road on Third street across complainant's right of way at right angles, when complainant commenced this action.

The Denver, Laramie & Northwestern Railway Company owns and operates a railroad from Denver into the city of Greeley and has under construction its line of road northerly from the city of Greeley. It organized the Greeley Terminal Railway Company, said terminal company owning and holding its terminal facilities and right of way in said city. Such terminal company obtained from the city council of Greeley authority to construct its line through and over certain of the streets in said city, but none of the right of way of the Denver, Laramie & Northwestern Railway Company or the Greeley Terminal Railway Company encroaches upon the 100-foot strip of complainant's right of way. It has at large expense purchased and obtained property from individuals apparently owning through mesne conveyances from the Union Colony; and in possession of portions of said 400-foot right of way outside of the 100-foot strip, removed buildings and obstructions therefrom and prepared the same for the laying of its tracks without any complaint upon the part of complainant until the commencement of this action.

The Chicago, Burlington & Quincy Railroad Company obtained by purchase and by condemnation proceedings, at an expense of many thousands of dollars, for the construction of its line of road, property included within complainant's claimed 400-foot strip and outside of the 100-foot strip, such purchases and condemnation proceedings being from and against the parties who acquired title by mesne conveyances from said Union Colony and upon a considerable portion of said property were dwelling houses and business buildings which had for

a long time theretofore been occupied as such, and claimed to be owned by the parties having title through said Union Colony, and without any protest from complainant or any of its predecessors. All of which was acquired openly and publicly, without any protest upon the part of complainant until about the time of the commencement of this action.

Considering all of the foregoing facts, that the acquisition of the property by the respondents is for public and not for private use, that the portion of the same which encroaches upon complainant's alleged right of way is not now required by the complainant, and, so far as is disclosed by the evidence, will not be necessary in the near future, to enable complainant to fully and freely discharge its duties to the public, we think complainant fully estopped from now claiming as against these respondents that it is entitled to the present possession of the entire 400-foot right of way; that the decree of the court below was right, and it is, therefore, affirmed.

REED, District Judge (concurring in part, and dissenting in part). I concur in the foregoing opinion that appellant is now estopped from claiming or having a right of way over the lands in controversy through the defendant city of Greeley in excess of 100 feet in width, except through blocks 42 and 59 in said city where its right of way and depot grounds are 200 feet in width as decreed by the Circuit Court; but I am of opinion that appellant's alleged right of way dates only from the act of Congress of March 3, 1869.

The lands over which the appellant claims its right of way are in section 32, township 6, and sections 5, 8, and 17, township 5 north, in range 65 west, in Weld county, Colo., and about midway between Denver, Colo., and Cheyenne, Wyo. The subdivisions thereof over which the appellant claims its right of way, except those in section 17, had been sold by the United States, or were subject to uncanceled pre-emption, homestead, or other claims of record in the local land office at Denver and recognized by that office as valid, at the time of the passage of the act of March 3, 1869, and were not then public lands of the United States. Kansas Pacific Co. v. Dunmeyer, 113 U. S. 629, 637, 5 Sup. Ct. 566, 28 L. Ed. 1122.

Appellant claims its right of way over these lands under the act of Congress of July 1, 1862 (12 Stat. 489), as the successor in title and interest of the Leavenworth, Pawnee & Western Railroad Company, one of the grantees named in said act, whose name was subsequently changed to the Union Pacific Railroad Company, Eastern Division, and later to the Kansas Pacific Railway Company (which for convenience will hereinafter be called the Kansas Company) and the acts of July 2, 1864 (13 Stat. 356), July 3, 1866 (14 Stat. 79); and of the Kansas Company and the Denver Pacific Railway & Telegraph Company under the act of March 3, 1869 (15 Stat. 324).

The acts of 1862, 1864, and 1866 were reviewed at some length by this court in the recent case of Stuart v. Union Pacific Railroad Company (this appellant) 178 Fed. 753, 103 C. C. A. 89, and the applicable parts thereof are set forth in the opinion in that case, and

need not be here repeated in full. The land involved in that suit is in the vicinity of, but easterly from, the city of Denver, and the road crossing it is that part of the line of the Kansas Company between the western boundary of Kansas and the city of Denver. A consideration of the act of March 3, 1869, was not necessary to a determination of that case, and it is there but little considered. That act is material to the determination of this controversy, and is as follows:

"Section 1. That the Union Pacific Railway Company, Eastern Division, be, and it hereby is, authorized to contract with the Denver Pacific Railway & Telegraph Company, a corporation existing under the laws of the territory of Colorado, for the construction, operation, and maintenance of that part of its line of railroad and telegraph between Denver City and its point of connection with the Union Pacific Railroad, which point shall be at Cheyenne, and to adopt the roadbed already graded by said Denver Pacific Railway & Telegraph Company as said line, and to grant to said Denver Pacific Railway & Telegraph Company the perpetual use of its right of way and depot grounds, and to transfer to it all the rights and privileges, subject to all the obligations pertaining to said part of its line.

"Sec. 2. That the said Union Pacific Railway Company, Eastern Division, shall extend its railroad and telegraph to a connection at the city of Denver, so as to form with that part of its line herein authorized to be constructed, operated and maintained by the Denver Pacific Railway & Telegraph Company, a continuous line of railroad and telegraph from Kansas City, by way of Denver to Cheyenne. And all the provisions of law for the operation of the Union Pacific Railroad, its branches and connections, as a continuous line, without discrimination, shall apply the same as if the road from Denver to Cheyenne had been constructed by the said Union Pacific Railway Company, Eastern Division; but nothing herein shall authorize the said Eastern Division company to operate the road or fix the rates of tariff for the Denver Pacific Railway & Telegraph Company...

"Sec. 3. That said companies are hereby authorized to mortgage their respective portions of said road, as herein defined, for an amount not exceeding $32,000 per mile, to enable them respectively to borrow money to construct the same; and that each of said companies shall receive patents to the alternate sections of land along their respective lines of road, as herein defined, in like manner and within the same limits as is provided by law in the case of lands granted to the Union Pacific Railway Company, Eastern Division: Provided, that neither of the companies hereinbefore mentioned shall be entitled to subsidy in United States bonds under the provisions of this act."

After the passage of the act of 1862, the Kansas Company in July of that year filed with the Secretary of the Interior a map showing the general route of its road, from the mouth of the Kansas river to Ft. Riley, Kan., thence northwesterly along the Republican river to a point on the 100th meridian of longitude in the then territory of Nebraska between the valleys of the Republican and Platte rivers, as required by that act. After the passage of the act of 1864, and in January, 1865, it filed another map designating substantially the same route shown in its map of 1862. February 21, 1866, after the expiration of the time for filing any map under the act of 1864, the company prepared another map, designating a route from Ft. Riley westwardly along the Smokey Hill river to the western boundary of Kansas and presented it to the Secretary of the Interior for approval. That officer refused to file or approve the same upon the ground that after designating its route by the map of 1862, which had been duly approved, and upon which the lands had been withdrawn from market,

the route could not rightly be changed without legislative permission to do so; and in this he was sustained by the then Attorney General of the United States. And see United States v. Northern Pacific R. Co. 152 U. S. 284, 292, 293, 14 Sup. Ct. 598, 38 L. Ed. 443. Thereupon the company applied to Congress for such legislation and procured the passage of the act of 1866. Under that act the Kansas Company, on July 11th after its passage, prepared and filed with the Secretary of the Interior a map changing the route as designated in the maps of 1862 and 1864, from Ft. Riley northwesterly along the Republican river to the 100th meridian in Nebraska, to one westerly from Ft. Riley along the Smokey Hill river to the western boundary of Kansas, far to the south of the route from Ft. Riley northwardly as shown in the prior maps; and on November 28, 1866, it prepared and filed another map showing a continuation of that route westwardly from the Kansas boundary to Ft. Collins, Colo., by way of Denver. These maps were duly approved by the Secretary of the Interior; and upon the lines designated therein the road was built by the Kansas Company from Ft. Riley to Denver and accepted by the President in October, 1872, when its right to the lands and right of way as far as Denver became complete.

In the summer of 1867 the main line of the Union Pacific Railroad Company was constructed to a point 106 miles northeasterly from Denver, to what is now the city of Cheyenne in Wyoming, and the village of that name came into existence about August of that year. The Kansas Company had not then constructed its road westwardly from Ft. Riley beyond some point in Kansas near thereto, and the people of Denver were in much doubt of its ever being built to that city. In November, 1867, the Denver Pacific Railway & Telegraph Company was incorporated under the laws of Colorado by residents of that territory for the purpose of building a road from Denver to a connection with the Union Pacific Railroad at Cheyenne, and the citizens of Denver and the county of Arapahoe, in which that city is situated, subscribed and paid $500,000 in aid of its construction. Shortly thereafter that company (which will be called the Denver Company) surveyed and established its route for such road from Denver along the South Platte river to what is now the city of Greeley, and thence northerly to Cheyenne, and in 1868 graded its road from Denver to Cheyenne, and over the land in controversy, which land was in 1870, included in a plat of the village of Greeley, and is now within the limits of that city. On March 16, 1869, after the passage of the act of March 3d of that year, the Kansas Company, as it was authorized by that act to do, made a contract with the Denver Company to construct the road from Denver to Cheyenne upon the line and roadbed so established and graded by the Denver Company, and the Denver Company built the road pursuant to that contract and that act to a connection with the Union Pacific road at Cheyenne in about 1872, and afterwards maintained and operated the same upon that line as an independent road, but as a part of a continuous line from the mouth of the Kansas river to Cheyenne, until it was consolidated with and became a part of the road of the appellant; and

it has ever since been operated by the appellant and its predecessors in title as a part of its road.

Accepting the decision in Stuart v. Railroad Company as the correct interpretation of the Acts of 1862, 1864, and 1866, so far as they relate to the construction of the road from Ft. Riley to Denver, without again considering that question, it does not follow, as it seems to me, that the route established by the Denver Company, and upon which it built the road from Denver to Cheyenne, was authorized by any act of Congress prior to that of March 3, 1869. The Kansas Company never filed any map showing the general route, or definite location of its road from Denver to Cheyenne, or to any other point on the line of the Union Pacific Railroad; though the Acts of 1862, 1864, and 1866, each required that it file a map of the general route of its road, showing its connection with that of the main line of the Union Pacific Company. Its map of November 28, 1866, designates a route from Denver northeasterly along the South Platte river to its junction with the Cache la Poudre river near to what is now the city of Greeley, thence nearly at right angles westerly along that river to Ft. Collins, and in an east and west direction over a part of the lands now in controversy within the city of Greeley; and it was evidently intended to afterwards extend it from Ft. Collins to a connection with the Union Pacific Railroad main line, westerly of the meridian of Denver, as authorized by the act of 1866, when that road should be constructed; but the authority to so extend it was revoked by the act of 1869, and it was never extended, and no road was ever built upon that route.

Section 2 of the act of 1869 shows upon its face that the route from Denver to Cheyenne was first authorized by that act. Its language is:

"That the said Union Pacific Railway Company, Eastern Division, *shall* extend its railroad and telegraph to a connection at the city of Denver, so as to form with that part of its line *herein authorized to be constructed, operated and maintained by the Denver Pacific Raidway & Telegraph Company*, a continuous line of railroad and telegraph from Kansas City, by way of Denver to Cheyenne; but nothing herein shall authorize the said Eastern Division Company *to operate the road or fix the rates of tariff for the Denver Pacific Railway & Telegraph Company.*"

The building of the road by the Denver Company upon the route so established by it in 1867 and 1868 was not, therefore, a mere deviation in construction of the road of the Kansas Company upon the route shown by its map from Denver to Ft. Collins, but was the construction of a road wholly upon a line and route established by the Denver Company as an independent corporation created under the laws of Colorado, and having no connection whatever with the Kansas Company prior to the contract between them of March 16, 1869. The Denver Company in so establishing and grading its road of course acquired no right of way, or other rights under the grant of Congress to the Kansas Company, and could not possibly acquire any until its route and roadbed were incorporated into and made a part of the road from the mouth of the Kansas river to Cheyenne by authority of Congress. Upon so adopting the route and road of the Denver Com-

pany, the Kansas Company abandoned its route from Denver to Ft. Collins; and the right of way for the road established and built by the Denver Company attached under its contract with that company pursuant to the act of March 3, 1869, and at the very earliest as of the date of that act only. If the Kansas Company had built its road through the city of Greeley upon the route designated by its map of November 28, 1866, or if the Denver Company had done so, there would be room to say under the authority of Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, and like cases, that the right of way for such road would attach as of the date of the act of 1866; and that deviations in the line of construction so as to include the lands in controversy was permissible; but no road was ever built upon that route, and it was abandoned as hereinbefore stated. The fact that the road of the Denver Company was built as far as Greeley along the South Platte river, near to the route of the Kansas Company, as shown in its map of November 28, 1866, does not alter the situation. The road from Denver to Cheyenne was not only first authorized by the act of 1869, but by that act it was expressly required that it should be built from Denver to Cheyenne, and the authority of the Kansas Company under prior acts to build a road to some other connection with the Union Pacific road is revoked by that act.

In Union Pacific Railroad Company (this appellant) v. Harris, 215 U. S. 386, 30 Sup. Ct. 138, 54 L. Ed. 246, the land there involved, which is in Saline county, Kan., westerly from Ft. Riley, was settled upon in April, 1861, under the pre-emption law then in force by one who preserved his rights under that entry until September, 1865, when he transmuted it to a homestead settlement and continued in possession until 1872, when he received a patent therefor from the government. It was the contention of the railroad company that because the settler in 1865 changed his pre-emption entry to a homestead settlement his right to the land attached as of that date only, which, being subsequent to the act of 1864, was inferior to its rights under that act. But Mr. Justice Brewer in delivering the opinion of the court said:

"Any possible rights of the railroad company in this land commence with the act of July 3, 1866, for while the acts of 1864 and 1866 were in amendment of the act of 1862, yet the route prescribed by the acts of 1862 and 1864 was far to the east of this land, and only by the act of 1866 was the company authorized to construct a road through or near it. True, as held in Railroad Company v. Baldwin, 103 U. S. 426, 26 L. Ed. 578 (and other cases), the grant of the right of way is absolute, and takes effect as of the date of the grant. *But that date must be found in an act prescribing the finally adopted route.*"

Conceding, as held in the Stuart Case, that sections 9 and 12 of the act of 1864 authorized the Kansas Company to build its road to Denver, then the act "prescribing the finally adopted route" as far as Denver might be found in that act. But the authority under section 12 of the act of 1864, "to make its road westward until it meets and connects with the Central Pacific Company of California *on the same line*," which plainly means the line of the Union Pacific road from its initial point on the 100th meridian in Nebraska to a connection with

the Central Pacific, was revoked by the act of 1866, which required a connection with the Union Pacific Railroad, "but not at a point more than 50 miles west from the meridian of Denver in Colorado." But this does not require the road to go to Denver, though it permits a connection with the Union Pacific Railroad at some point on the line of that road between its initial point in Nebraska on the 100th meridian, and the meridian of Denver. Such a connection had not been made at the time of the passage of the act of March 3, 1869, and it is entirely plain that the permission to go farther west than the meridian of Denver was revoked by that act, the road required to be built from Denver to Cheyenne, which is somewhat easterly from Denver, and there connect with the Union Pacific road. The act of 1869, is, therefore, the first and only act of Congress "prescribing the route for this road from Denver to Cheyenne"; and if the grant of the right of way takes effect as of the date of an act "prescribing the finally adopted route," and this is not controverted, the conclusion is unavoidable that the right of either the Kansas or the Denver Company to a right of way from Denver to Cheyenne under any act of Congress attaches, if at all as against pre-emption, homestead, or other claims of record in the proper land office, as of the date of the act of March 3, 1869, only. United States v. Northern Pacific Ry. Co., 152 U. S. 284–292, 298, 14 Sup. Ct. 598, 38 L. Ed. 443.

The subdivisions of the sections of land named over which appellant claims its right of way, and the existing homestead settlements, pre-emptions and other claims of record thereon at the time of the passage of the act of 1869, as shown by the local land office at Denver, are as follows:

The south half of the southwest quarter of section 32, and the north half of the northwest quarter of section 5: On June 23, 1865, Andrew D. Lemon filed a pre-emption declaratory statement upon these tracts. He made final proofs and paid for the land in February, 1867, and a patent was issued to him October 1st following. The records show that Lemon first settled upon the land May 1, 1864. (One-half mile of the right of way claimed is over these subdivisions.)

The southeast quarter of the southwest quarter of section 5: September 22, 1866, Knute Nelson filed a pre-emption claim for this tract and 40 acres in section 8, alleging settlement thereon upon that date. January 21, 1873, the entry was canceled, for some reason, by the Commissioner of the General Land Office, and the tract was patented to the Denver Company April 24, 1875, as inuring to it under the act of 1869.

The southwest quarter of the southeast quarter of section 5: September 19, 1866, Calvin Roher filed a pre-emption claim upon this tract. September 18, 1885, D. P. Terrell filed a homestead application therefor, which was rejected and an appeal taken. July 8, 1886, the mayor of the city of Greeley entered the same for cash under the town-site act for the benefit of the inhabitants of said city, and a patent was issued therefor for the benefit of the city October 3, 1889.

The northeast quarter of the northwest quarter of section 8: This tract was included in the pre-emption claim of Knute Nelson, filed

September 22, 1866, and canceled January 21, 1873, as before stated. October 9, 1869, Lewis F. Bartels entered the land for cash and a patent was issued to him therefor December 15, 1870.

The west half of the northeast quarter of section 8: December 1, 1866, D. H. Williams filed a homestead entry upon this land. April 20, 1870, he made final proof, and a patent was issued to him for the land September 20, 1870.

The west half of the southeast quarter of section 8: November 24, 1866, John S. Reed filed a pre-emption claim for this tract, alleging settlement upon that date. November 6, 1868, Cornelius C. Conklin filed a pre-emption claim alleging settlement by him on August 20, 1868. June 14, 1869, Conklin made final proofs, and a patent was issued to him November 25, 1870.

Section 17: This section was selected by the Denver Company October 13, 1874, as inuring to it under the act of 1869, and a patent was issued to it therefor, with other lands, April 24, 1875. No preemption or homestead claims are shown to have been filed upon this land.

The acceptance by the Land Department of the government of these several entries withdrew these lands from the category of public lands, and from the operation of the act of 1869. Railroad Company v Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Hastings, etc., Railroad Co. v. Whitney, 132 U. S. 359, 10 Sup. Ct. 112, 33 L. Ed. 363; United States v. Northern Pacific Ry. Co., 152 U. S. 284 - 298, 14 Sup. Ct. 598, 38 L. Ed. 443; Northern Pacific Ry. Co. v. Trodick, 221 U. S. 208, 31 Sup. Ct. 607, 55 L. Ed. 704.

If the right of way over these lands attached in favor of the Kansas Company as of the date of the act of 1864, or of 1866, without the filing of any map, or the construction of any road authorized by them, such right of way of course antedates these several claims, except that of Lemon which was settled upon in May, 1864, previous to the act of that year. It is true that mere settlement upon and occupation of the public lands, without more, does not vest any right in the settler to the land as against the government. But it has been the uniform holding of the land department, and of the Supreme Court, under the pre-emption and homestead laws, that one who in good faith settles upon and improves a tract of land, subject at the time of such settlement to private entry, or to homestead settlement, with intent to preempt or procure the same as a homestead, will be given the prior right to acquire the land upon compliance with the law, as against one who claims a right thereto arising subsequent to such settlement. Buxton v. Traver, 130 U. S. 232–236, 9 Sup. Ct. 509, 32 L. Ed. 920; Frisbie v. Whitney, 9 Wall. 187–195, 19 L. Ed. 668; Nelson v. Northern Pacific Ry. Co., 188 U. S. 108–125, 23 Sup. Ct. 302, 47 L. Ed. 406; Northern Pacific Ry. Co. v. Trodick, 221 U. S., 31 Sup. Ct., 55 L. Ed., above.

But I am unable to believe that it was intended by these acts of Congress to give to the Kansas Company an unlimited right to build its road upon any line it might thereafter select, between the mouth of the Kansas river and the western boundary of Nevada, regardless of

the rights of settlers or others who might acquire interests in the land before the route was selected and the required map thereof filed with the Secretary of the Interior. Washington & Idaho R. R. Co. v. Osborn, 160 U. S. 103–109, 16 Sup. Ct. 219, 40 L. Ed. 356. The right of way and the granted lands are both in aid of the construction of the road, and the map of general route is as essential to give precision to the right of way as it is to the granted lands. Missouri, K. & T. Ry. Co. v. Cook, 163 U. S. 491–496, 497, 16 Sup. Ct. 1093, 41 L. Ed. 239; United States v. Northern Pacific Ry. Co., 152 U. S., 14 Sup. Ct., 38 L. Ed., above. As to the lands, those to which a pre-emption, homestead, or other right to acquire them from the United States has attached. when the map of definite location of the road was filed, are reserved from the operation of the grant; as to the right of way, that attaches as of the date of the act which provides for the finally adopted route. The filing of a map of the general route of the road is required by all of the acts except that of 1869; and that act designates the line and route of the road from Denver to Cheyenne with the precision of a survey; no map of that route was therefore required. Until the required map of general route is filed, or the road is built under the authority of Congress, the lands in aid of the construction, and over which the road is to be built, remain subject to disposal by the United States. Kansas Pacific Co. v. Dunmeyer, 113 U. S. 629–637, 638, 5 Sup. Ct. 566, 28 L. Ed. 1122; United States v. Northern Pacific Ry. Co., 152 U. S. 284–298, 14 Sup. Ct. 598, 38 L. Ed. 443.

United States v. Union Pacific Ry. Co., 148 U. S. 562, 13 Sup. Ct. 724, 37 L. Ed. 560, relied upon by appellant, involved only the question of the rights of the defendant companies, as against the United States, to lands southwest of Denver, west of the Kansas road, and southwest of the road of the Denver Company at that place, some 200,000 acres in the outer angle formed by the connection of the two roads at Denver; the contention of the government being that the road of the Kansas Company ended at Denver and that of the Denver Company began at that place, and that the two roads had no connection with each other within the meaning of the act of 1869. The Acts of 1862, 1864, and 1866, required a continuous line of road from the Missouri river to the Pacific Ocean, and it was held that it was not intended by the act of 1869 to break the continuity of such line, and that the lands in controversy, therefore, passed to the two companies. No other question was involved. The case was determined upon a demurrer and plea to the bill which alleged facts substantially different from those shown by the proofs in this case. The opinion plainly indicates, however, that the rights of the Kansas Company date only from the act of 1866. For the same reason the rights of the Denver Company would date only from the act of 1869. But the respective dates when the right of each company attached were not important in that case; the important question being, Were the companies, as against the United States, entitled to these particular lands? The fact that the rights of the Denver Company would attach only as of the date of the act of 1869 would not have the effect of breaking the

continuity of the line from the Missouri river to the Pacific Ocean, required by the prior acts of Congress.

Missouri, Kansas & Texas Railway Company v. Kansas Pacific Co., 97 U. S. 491, 24 L. Ed. 1095, involved the rights of the two companies to lands in the state of Kansas west of Ft. Riley. The lands were withdrawn from sale July 26, 1866, by the Secretary of the Interior for the benefit of the Kansas Company, under its map of July 11, 1866, filed pursuant to the act of July 3d, of that year, designating the route of its road from Ft. Riley to the western boundary of Kansas. The claim of the Missouri, Kansas & Texas Company to the lands was under the act of Congress of July 26, 1866, and inferior, therefore, to the rights of the Kansas Company. The rights of settlers upon the lands, if any, or of others than the two railroad companies, parties to that suit, were not involved and of course are not affected by the decision.

United States v. Kansas Pacific Company, 99 U. S. 455, 25 L. Ed. 289, involved the right of the United States to a lien upon the road west of the 100th meridian of longitude for 5 per cent. of the net earnings of the company upon that portion of its road. The lien was denied. What is said in the opinion in this and the preceding case should be limited, under familiar rules, to the questions involved.

I am, therefore, of the opinion that appellant's right of way over the lands in question attached only as of the date of the act of March 3, 1869; and, as to the lands in sections 32, 5, and 8, its rights are inferior to those of all of the defendants, except as to the 100 feet, and the 200 feet in blocks 42 and 59, as decreed by the Circuit Court.

No part of section 17 had been sold, and there were no pre-emption or other claims of record against any part thereof at the date of the passage of the act of 1869. That section with other lands was selected by the Denver Company in October, 1874, as inuring to it under that act, and a patent issued to it therefor, April 24, 1875. That company, therefore, acquired full title to this land. It was acquired, however, by the Union Colony in 1870, with other lands under the conveyance, from John Evans as trustee of the Denver Company under its deed of trust of August, 1869, made pursuant to the act of March 3d, of that year, and was included by the Union Colony in its plat of the village of Greeley in 1870. As I understand the record the city of Greeley only is interested in that portion of the appellant's right of way over this section, and only for the use of its streets Nos. 20 to 23, inclusive, in the south part of the city where they cross the same. The right of the city to lay its streets *across* the right of way and use them as public streets cannot, I think, be prevented by the appellant. Northern Pacific Ry. Co. v. Townsend, 190 U. S. 267–272, 23 Sup. Ct. 671, 47 L. Ed. 1044. The decree should therefore be affirmed.

SANBORN, Circuit Judge, concurs in the opinion and conclusion that a strip 400 feet in width was granted in the lands in question by the act of July 2, 1864, and dissents from the opinion and conclusion that any of this strip has been lost by the grantee or its successors in interest by estoppel on the ground that these grantees could not by

indirection—that is, by estoppel—part with that public right and trust which they could not convey by deed or lose by the possession of others and the statute of limitations. Northern Pacific R. Co. v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157; Northern Pacific R. Co. v. Townsend, 190 U. S. 267, 271, 272, 23 Sup. Ct. 671, 47 L. Ed. 1044; Northern Pacific R. Co. v. Ely, 197 U. S. 1, 25 Sup. Ct. 302, 49 L. Ed. 639; Kindred v. Union Pacific R. Co., 94 C. C. A. 112, 117, 168 Fed. 648, 653, 654.